1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3        HONORABLE GEORGE P. SCHIAVELLI, JUDGE PRESIDING

4    CLASSIC CONCEPTS,              )
                                    )
5                       Plaintiff,  )
                                    )
6           Vs.                     )   No CV04-8088 GPS(MANX)
                                    )
7    LINEN SOURCE, INC.,            )
                                    )
8                       Defendant.  )
                                    )
9    ─────────────────────────     )
                      AND           )
10   CLASSIC CONCEPTS , INC.,       )
                                    )
11                      Plaintiff,  )
                                    )
12          Vs.                     )
                                    )
13   HELLENIC RUG IMPORTS, INC.,    )
                                    )
14                      Defendant.  )
                                    )
15   ─────────────────────────

16

17        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

18               LOS ANGELES, CALIFORNIA

19              TUESDAY, AUGUST 21, 2007

20

21

22           LEANDRA AMBER, CSR 12070, RPR
           OFFICIAL U.S. DISTRICT COURT REPORTER
23           312 NORTH SPRING STREET, # 442
             LOS ANGELES, CALIFORNIA 90012
24                (213) 613-0179

25

1                        **A P P E A R A N C E S**

2

3      **IN BEHALF OF THE PLAINTIFF,**      THE SONI LAW FIRM
       **CLASSIC CONCEPTS:**                BY:  SURJIT SONI, ESQ.
4                                               DANTON RICHARDSON, ESQ.
                                            55 SOUTH LAKE AVENUE
5                                           SUITE 720
                                            PASADENA, CALIFORNIA 91101
6                                           (626) 683-7600

7

8

9

10     **IN BEHALF OF THE DEFENDANT,**      PAUL HASTINGS JANOFSKY &
       **LINEN SOURCE, INC.:**              WALKER LLP
11                                          BY:  DENNIS S. ELLIS, ESQ.
                                                 GEOFF STOVER, ESQ.
12                                          515 SOUTH FLOWER STREET
                                            25TH FLOOR
13                                          LOS ANGELES, CALIFORNIA 90071-2228
                                            (213) 683-6264
14

15

16

17     **ALSO APPEARING:**

18

19

20

21

22

23

24

25

3

**I N D E X**

|  | PAGE |
|---|---|
| DEFENSE RESTS | 15 |
| PLAINTIFF'S REBUTTAL CASE | 16 |
| PLAINTIFF RESTS | 74 |
| PLAINTIFF'S MOTION FOR SANCTIONS | 77 |
| DEFENSE'S MOTION TO STRIKE TESTIMONY | 78 |
| MOTION FOR JUDGMENT OF LAW | 84 |

**DEFENSE WITNESS**

| **BRUCE STROMBOM** | **6** |
|---|---|
| **CROSS-EXAMINATION (RESUMED) BY MR. RICHARDSON** | |

**PLAINTIFF'S REBUTTAL WITNESS**

**HENRY J. KAHRS**

| DIRECT EXAMINATION BY MR. RICHARDSON | 16 |
|---|---|
| CROSS-EXAMINATION BY MR. ELLIS | 30 |
| REDIRECT EXAMINATION BY MR. RICHARDSON | 47 |
| RECROSS-EXAMINATION BY MR. ELLIS | 50 |
| FURTHER REDIRECT EXAMINATION BY MR. RICHARDSON | 54 |
| FURTHER RECROSS-EXAMINATION BY MR. ELLIS | 55 |

**HARPAL SINGH** 57

| DIRECT EXAMINATION BY MR. SONI | |
|---|---|
| CROSS-EXAMINATION BY MR. ELLIS | 61 |

**EXHIBITS** | | **IDENTIFIED**

| EXHIBITS | IDENTIFIED |
|---|---|
| 5 | 65 |
| 46 | 71 |
| 109 | 8 |
| 153 | 9 |
| 154 | 18 |

```
 1        LOS ANGELES, CALIFORNIA; TUESDAY, AUGUST 21, 2007; 9:32 A.M.

 2                              -o0o-

 3

 4             THE CLERK:  Calling Item Number 1, Civil 04-8088,

 5    Classic Concepts versus Linen Source, Inc., and Civil

 6    04-8457, Classic Concepts, Inc., versus Hellenic Rug Imports,

 7    Inc.

 8             Counsel, would you state your appearances, please.

 9             MR. SONI:  Good morning, your Honor.

10             Surge Soni and Danton Richardson of the Soni Law

11    Firm on behalf of the plaintiff.

12             MR. ELLIS:  Good morning, your Honor.

13             Dennis Ellis, Paul Hastings Janofsky & Walker, on

14    behalf of the defendants.

15             MR. STOVER:  Good morning, your Honor.

16             Geoff Stover on behalf of the defendants.

17             THE COURT:  Good morning, everybody.

18             What I'm going to do today -- we will be doing is

19    first we'll be completing the testimony, the evidentiary

20    portion of this case, then I'm going to excuse the jury, and

21    I will then deal with your several motions that have been

22    filed.  Then --

23             I will say this:  The jury instructions I have

24    received are a mess.  The -- I asked for a set of jury

25    instructions, agreed upon and disputed, and it was supposed
```

1    to be in by yesterday, I think I said, by noon.  I'm getting

2    instructions, supplemental instructions, objections to

3    supplemental instructions, further supplemental instructions.

4    So right now the jury instruction materials I have are about

5    this thick.

6           There's no -- apparently no agreement on anything

7    except maybe three or four instructions and special verdicts.

8    So what I'm going to do at that point is send you all out,

9    and you can either stay here -- I think you're more

10   professional than that -- and you are going to get together,

11   and you are going to work out some agreed-upon jury

12   instructions.  This case is not that complicated.

13          You are going to agree on some jury instructions,

14   and you are going to get me a set, including a disc, with

15   agreed-upon jury instructions -- and there should be numerous

16   agreed-upon instructions at this point -- and the disputed

17   instructions with each side's position in one set and the

18   same thing with the verdict forms.

19          Those instructions will have a set with annotations

20   and a set without annotations, which I am supposed to

21   receive.  They will be indexed.  The index will not go to the

22   jury, but I expect them to be indexed.

23          Now, if you can't reach agreement to work through

24   what I see here -- and many of these instructions are

25   argumentative and are clearly improper from both sides.  If

1   you cannot go out there as professionals and agree upon some

2   instructions, then I will likely just give the Ninth Circuit

3   instructions.  So it's your choice, but that's the way we're

4   going to go today.

5            All right.  Bring down the jury, please.

6            The witness may take the stand.

7            (Whereupon, at 9:36 a.m. the jury entered the

8            courtroom.)

9            THE COURT:  All right.  You may be seated.

10           All right.  Back on the record.

11           The jurors are present in their seats.

12           Good morning, ladies and gentlemen.  I hope you all

13   had a pleasant weekend.

14           The witness is back on the stand.

15           You understand you have been sworn, you are still

16   under oath?

17           THE WITNESS:  I do.

18           THE COURT:  All right.  You may proceed.

19                        **BRUCE STROMBOM,**

20   called as a witness by counsel for the defendants, having

21     been previously duly sworn, testified as follows:

22           MR. RICHARDSON:  Thank you, your Honor.

23                  **CROSS-EXAMINATION  (RESUMED)**

24   BY MR. RICHARDSON:

25   Q.   Good morning, Mr. Strombom.

1    A.    Good morning.

2    Q.    You're not an expert in copyright law; correct?

3    A.    No.  I don't consider myself to be an expert in the law.

4    I'm an economist.

5    Q.    And you're not here to give any opinion about

6    infringement or any issues regarding copyright; correct?

7    A.    That's correct.  I'm assuming infringement from my

8    calculations.

9    Q.    Okay.  Your job here is just to calculate numbers

10   regarding damages or profits; correct?

11   A.    It's to estimate damages and to comment upon the

12   opposing expert's opinion of damages.

13   Q.    The other day before we broke, we were looking at

14   Exhibit 218.

15           MR. RICHARDSON:  It's admitted, your Honor.

16           May I publish?

17           THE COURT:  You may.

18   BY MR. RICHARDSON:

19   Q.    And we referred to the fact that here under the

20   "Advertising Cost" you didn't actually look at any invoices

21   or any canceled checks or anything like that paying for any

22   of the claimed advertising costs; correct?

23   A.    I didn't look at underlying source documents as is

24   typical for damages experts.

25   Q.    Now, one thing you did indicate was that to try to

1   cross-check these numbers, you looked to a financial

2   statement; is that correct?

3           MR. STOVER:  Objection.  Mischaracterized the

4   testimony.

5           THE COURT:  Overruled.

6           Is that correct?

7           THE WITNESS:  I believe we were talking about

8   Hellenic at the time, if I'm not mistaken.

9           MR. RICHARDSON:  Okay.  Let me switch exhibits

10  then.

11          Exhibit 109.

12          THE COURT:  Go ahead.

13  BY MR. RICHARDSON:

14  Q.   So in order to cross-check the claimed overhead expenses

15  from Exhibit 109 regarding Hellenic, it was your testimony

16  you had looked to a financial statement or financial

17  statements regarding Hellenic; correct?

18  A.   Yes.  I verified the allocation by looking at the

19  financial statements.

20  Q.   Okay.  Now, if you did not -- excuse me.

21          If you did not have financial statements to look

22  to, isn't it true, sir, that Exhibit 109 is not the type of

23  summary document you would rely on in allocating -- or,

24  rather, deducting overhead costs?

25  A.   I would like to go further either by asking -- talking

1    with people who are familiar with the financials or looking

2    for additional financial records.

3    Q.   The other day we also looked at Exhibit 153, marked for

4    identification.

5              MR. RICHARDSON:  May I publish, your Honor?

6              THE COURT:  Yes.

7    BY MR. RICHARDSON:

8    Q.   And I believe we verified that if you look to the sales

9    made by Hellenic to its customers or Linen Source to its

10   customers as lost sales to Classic Concepts, this would be

11   the method you would use to determine the loss profits to

12   Classic; correct?

13             MR. ELLIS:  Objection.  Asked and answered.

14             THE COURT:  Overruled.

15             THE WITNESS:  No.  My testimony was that this would

16   be part of the calculation you would do, but you would also

17   deduct an allocable portion of the other costs incurred by

18   Hellenic and Linen Source that contributed to the sales in

19   order to determine the profitability.

20   BY MR. RICHARDSON:

21   Q.   Okay.  And as to that, you estimated -- or, rather,

22   presumed that commissions and shipping would also need to be

23   deducted; correct?

24             MR. ELLIS:  Objection.  Asked and answered.

25   Cumulative.

1          THE COURT:  Sustained.

2    BY MR. RICHARDSON:

3    Q.   Well, just to sum up, if we put aside for a moment any

4    claims shipping or commission charges, this, as what we see

5    on Exhibit 153, would be the correct method to determine the

6    lost profits to Classic Concepts if we look to the sales made

7    to both Hellenic and Linen Source customers; correct?

8          MR. ELLIS:  Objection.  Asked and answered.

9    Cumulative.  Vague.

10         THE COURT:  Rephrase the question on the last

11   ground.

12   BY MR. RICHARDSON:

13   Q.   If we put aside for the moment any claimed commission

14   charges or shipping charges, the calculations we see on

15   Exhibit 153 are the correct calculations to arrive at the

16   lost profits Classic Concepts would have incurred judging

17   by 00 or going by the lost -- the sales made by Hellenic Rugs

18   to its customers and Linen Source to its customers?

19         MR. ELLIS:  Objection.  Compound.  Vague.

20         THE COURT:  Overruled.

21         THE WITNESS:  On the assumption that those sales

22   would have been made and ignoring those other costs,

23   incomplete though it is, that would be the calculation.

24         Go ahead.

25

1    BY MR. RICHARDSON:

2    Q.   Okay.  Now, it was your testimony that you would look to

3    the sales -- rather, the purchases made by Linen Source and

4    Hellenic rugs; correct?

5    A.   As to the lost profits of Classic Concepts, that's

6    correct.

7    Q.   So let's walk through the numbers that way then, just as

8    an alternative.

9         If we look to Hellenic, we would still have the

10   same sales number; correct?

11        MR. ELLIS:  Objection.  Mischaracterizes his

12   testimony.

13        THE COURT:  Sustained.

14   BY MR. RICHARDSON:

15   Q.   Well, let's start over.

16        What amount did Hellenic Rugs pay for the Diamond

17   Kilim rugs it distributed -- or Diamond Kilim products it

18   distributed?

19   A.   $12,402.

20   Q.   Now, to arrive at what the lost profits Classic Concepts

21   would have incurred if those sales would have been made by it

22   rather than Surya, what calculations will be made?

23   A.   There are two.  First, calculate the gross margin on

24   those sales.

25   Q.   Okay.  So that's to multiply times the 46.6 percent;

1    correct?

2    A.    That's correct.

3    Q.    And what would that number be, sir?

4    A.    That would be $5,779.

5    Q.    Say that again.  I'm sorry.

6    A.    $5,779.

7    Q.    And you say there's another calculation you would want

8    to make?

9    A.    That's right.

10          I would -- I would deduct the other expenses that

11   are variable with the sale of these rugs, which are -- are

12   commissions and shipping.

13   Q.    Now, again, if we -- assume for the moment that shipping

14   and commissions are not included as part of this; in other

15   words, in these revenues, you wouldn't deduct those expenses;

16   right?

17          MR. ELLIS:  Objection.  Vague.

18          THE COURT:  Sustained.

19   BY MR. RICHARDSON:

20   Q.    Let me rephrase.

21          If we -- if the commissions -- rather, if Classic

22   Concepts would not pay commissions on its Diamond Kilim rug

23   sales, you wouldn't deduct any commission charges; correct?

24   A.    If there were no commissions paid, I wouldn't deduct

25   those expenses.

1    Q.    Right.

2          And if shipping is not included in the revenue

3    number, you wouldn't deduct it on the back end either, would

4    you?

5          MR. ELLIS:  Objection.  Vague.

6          THE COURT:  Overruled.

7          THE WITNESS:  If it was --

8          THE COURT:  It does seem to cover this.

9          But go ahead.

10          THE WITNESS:  If it was a cost that was incurred by

11   Hellenic, then I would deduct it.

12   BY MR. RICHARDSON:

13   Q.    Okay.  So -- but if the evidence shows that it's not a

14   cost that's included within -- or applicable regarding the

15   Diamond Kilim products, you wouldn't make that deduction;

16   correct?

17          MR. ELLIS:  Objection.  Asked and answered.

18   Cumulative.

19          THE COURT:  Sustained.

20   BY MR. RICHARDSON:

21   Q.    Let's move to Linen Source.

22          What amount did Linen Source pay for the Diamond

23   Kilim products it sold?

24   A.    $1,102.

25   Q.    One thousand -- what was that?

UNITED STATES DISTRICT COURT

1    A.   $1,102.

2    Q.   And to arrive at the lost profits Classic Concepts

3    incurred, we would multiply again times the 46.6 percent;

4    correct?

5    A.   I would, yes, to arrive at the gross margin.

6    Q.   Okay.  And that number is what, sir?

7    A.   $514.

8    Q.   And the other charges, shipping and commissions -- we

9    wouldn't deduct those if those are not -- rather, let me ask.

10        If shipping is not included in the top number, we

11   wouldn't deduct it out of the bottom number; correct?

12        MR. ELLIS:  Objection.  Asked and answered.

13   Cumulative.

14        THE COURT:  Overruled.

15        THE WITNESS:  It's not whether it's included in the

16   top number.  It's whether it's a cost that was incurred by

17   Linen Source that's pertinent to these sales.

18   BY MR. RICHARDSON:

19   Q.   Okay.

20   A.   So if it was a cost, I would deduct it.

21   Q.   Okay.  Let me rephrase it then.

22        If it's shown that there were no shipping costs

23   that Classic Concepts would incur regarding the Diamond Kilim

24   products, you wouldn't deduct that as a charge; correct?

25   A.   If it wasn't --

```
 1              MR. ELLIS:  Objection.  Asked and answered.
 2    Cumulative.
 3              THE COURT:  Sustained.
 4              MR. RICHARDSON:  One moment, your Honor.
 5              THE COURT:  Sure.
 6              (An off-the-record discussion was held.)
 7              MR. RICHARDSON:  No further questions at this time.
 8              THE COURT:  Thank you.
 9              Redirect.
10              MR. ELLIS:  No further questions, your Honor.
11              THE COURT:  All right.  The witness may step down.
12              Thank you.
13              Defense's next witness.
14              MR. ELLIS:  Subject to the admission of additional
15    exhibits, the defense rests.
16              THE COURT:  Thank you.
17              Any rebuttal?
18              MR. SONI:  Yes, your Honor.
19              We have a brief rebuttal.  Of course we have the
20    motion at the close of defense's case if you want to take
21    that up.
22              THE COURT:  I'll deal with the motion later --
23              MR. SONI:  All right, your Honor.
24              THE COURT:  -- but the motion has been filed.
25              Any rebuttal?
```

1          MR. SONI:  Yes, your Honor.

2          We do have a rebuttal.  It will be Mr. Henry Kahrs.

3          THE COURT:  Please take the stand.

4          You understand you have already been sworn; you are

5     still under oath?

6          THE WITNESS:  Yes.

7                        **HENRY J. KAHRS,**

8      called as a witness by counsel for the plaintiff(s) having

9          been previously duly sworn, testified as follows:

10          THE COURT:  All right.  Have a seat.

11          Mr. Richardson, you may proceed.

12          MR. RICHARDSON:  Thank you, your Honor.

13                     **DIRECT EXAMINATION**

14     BY MR. RICHARDSON:

15     Q.   Mr. Kahrs, I would like to pick up where we left off the

16     other today.  I've put on the screen again what was marked

17     for identification as Exhibit 153.

18          I don't know if you were here and heard

19     Mr. Strombom testify, but he indicated that there were some

20     additional deductions that would need to be made from these

21     numbers, namely commissions and shipping charges.

22          Did you make those deductions?

23     A.   I did not, no.

24     Q.   And why is that?

25     A.   Well, as for the commissions I had a discussion with a

1    representative of Classic Concepts, who stated that normally

2    they would not pay commissions on the Diamond Rug Kilim

3    pattern -- or the Diamond Kilim rug pattern.

4            As for the shipping -- and I verified this on some

5    of the invoicing, the practice is to add shipping costs to

6    the sales amount.  So, for example, if you were going to bill

7    the customer $100 for shipping, you would have to add that to

8    the $29,380 and then deduct it as a cost.  So in essence it

9    would become a wash.

10           So because you didn't add the shipping costs on as

11   additional revenue, you wouldn't deduct them as a cost.

12   Q.   Now, Mr. Strombom has indicated -- well, let me verify.

13           In the numbers we calculated on Exhibit 153,

14   that's -- that assumes that the lost sales to Classic

15   Concepts would be the sales to Hellenic Rugs customers and

16   Linen Source customers; correct?

17   A.   That's correct, yes.

18   Q.   Now, if we look to the lost sales being the purchases by

19   Hellenic Rugs and by Linen Source, what would those numbers

20   be?

21   A.   Well, looking at the exhibit you put up there, I agree

22   with Mr. Strombom on the $12,402 as the purchase amount made

23   by Hellenic, which is what Classic would have sold it to

24   Hellenic for.

25           I agree on the margin of 46.6 percent, and I agree

UNITED STATES DISTRICT COURT

1    on the math that it equals $5,779.  My comments on shipping

2    and commissions are exactly the same as Hellenic.

3    Q.   Okay.  Now, if we look to the purchase by Linen Source

4    as being the lost sale to Classic Concepts, are these numbers

5    correct?  We see on exhibit -- what I've marked for

6    identification as Exhibit 154.

7    A.   Yes, I agree with the 1102.  I agree with the

8    46.6 percent.  I agree with the $514 on the math -- same

9    comments on the shipping and the commissions.

10   Q.   Now, previously we didn't get into any profits that may

11   have been made by Hellenic or Linen Source; correct?

12   A.   That's correct.

13   Q.   Now, if we do those calculations, how would we go about

14   arriving at those numbers?

15           MR. ELLIS:  Objection.  Beyond the scope.

16           THE COURT:  This is rebuttal.  We're in a new --

17   sustained.

18           MR. RICHARDSON:  Your Honor, may I have a sidebar?

19           THE COURT:  Yes.

20           With the reporter, please.

21           (The following was heard at sidebar.)

22           MR. SONI:  We went through this in plaintiff's

23   case-in-chief.  There were no evidence of costs offered, any

24   claimed costs as of yet, and we had met our burden simply by

25   putting on the revenues.  Now that there are evidence of

```
 1    costs, we would like Mr. Kahrs to address those.

 2              MR. ELLIS:  No.  That was something that they had

 3    to do in the case-in-chief.  They didn't do it.  They didn't

 4    raise the issue of profits.  We raised the issue with the

 5    cost; that cost that was changing his report, not dealing

 6    with that.  We had a motion --

 7              THE COURT:  Yeah.  I know you had a motion.

 8              MR. ELLIS:  -- with Kahrs, and it can't come out in

 9    the rebuttal for the very first time of their claim of

10    damages of profits, which are other --

11              THE COURT:  You can attack Mr. Strombom's

12    assessment of the costs, but I don't want to hear, you know,

13    his case of new theory on profits.  He can show why

14    Mr. Strombom isn't correct, but that's it.

15              MR. RICHARDSON:  Okay.

16              (The following was heard in open court.)

17              THE COURT:  Whenever you are ready, you may

18    proceed.

19              Thank you, Counsel.

20    BY MR. RICHARDSON:

21    Q.   Mr. Kahrs, Mr. Strombom -- you're familiar with his

22    reports prepared in this matter; correct?

23    A.   Yes, I am.

24    Q.   In arriving at profits, what calculations -- rather, let

25    me rephrase.
```

1          In arriving at profits earned by Hellenic Rugs and

2    Linen Source, what were the nature of the calculations made

3    by Mr. Strombom?

4    A.   Mr. Strombom took the total sales -- let's start with

5    Hellenic, which were $29,380.  He deducted the cost of sales,

6    which was $12,402.  Then I believe he also deducted the cost

7    of duties and freight and an additional line item called cost

8    of sales and then general and administrative expense or

9    overhead and came down to a number of $4,047.

10   Q.   Okay.  Now, let's walk through that.

11          There was -- what deduction for cost of sales?

12   A.   It was the direct cost of $12,402.

13   Q.   And what were the other deductions?

14   A.   Cost of duties and freight, $1,860.

15   Q.   Anything else?

16   A.   There is an additional 620, which just says cost of

17   sales.

18   Q.   Anything else?

19   A.   $10,450 for general and administrative expense or

20   overhead.

21   Q.   Was Mr. Strombom correct in this instance to deduct any

22   general admin or overhead charges?

23   A.   I don't believe so, no.

24   Q.   And why is that?

25   A.   Well, I think there's a couple of reasons.

1           The first is in order for it to be a cost, in my

2   mind the first thing you look at, is an incremental.  General

3   and administrative normally would not.  It could include

4   rent.  It could include insurance.  It could include payroll.

5   And, you know, for a small volume of rug sales, I don't think

6   they had to rent the extra space or add general

7   administrative.

8           I think the second issue is you need to go through

9   and look at the categories included in there to find out if

10  there is a direct relationship to sales.  And the only

11  document that I've seen is whatever exhibit you put up -- was

12  that one --

13  Q.   It's Exhibit 109.

14  A.   109.

15           -- which doesn't have any of that detail.

16           MR. RICHARDSON:  If I may publish.

17           THE COURT:  Yes.

18  BY MR. RICHARDSON:

19  Q.   Exhibit 109 we now have on the screen.

20           Is that what you're referring to, Mr. Kahrs?

21  A.   That's correct.

22  Q.   What are the issues with -- relying on this document?

23  A.   Well, I think Mr. Strombom actually testified a minute

24  ago that this isn't a document he would normally rely on.  He

25  would want to go further.

```
 1              MR. ELLIS:  Objection.  Objection.  Nonresponsive.

 2    Move to strike.

 3              THE COURT:  Sustained.

 4    BY MR. RICHARDSON:

 5    Q.   Is Exhibit 109 a document you would rely on in making

 6    deductions of claim cost?

 7    A.   No, it's not.

 8    Q.   Why is that?

 9    A.   This is simply a document produced by one of the parties

10    in the matter.  It's not really a normal accounting record.

11    It's just a spreadsheet that someone put up there.  It

12    doesn't haven't any backup documents.  It doesn't tie to any

13    financials that I've been provided with.

14              MR. ELLIS:  Objection.  Move to strike.

15    Nonresponsive.

16              THE COURT:  Denied.

17    BY MR. RICHARDSON:

18    Q.   You can continue, sir.

19    A.   Those are the main reasons.  It's not an accounting

20    document.  It has no backup to it.  There's no invoicing, and

21    it doesn't tie to any financial statements that I've been

22    provided with.

23    Q.   Put simply, there's no way to verify the numbers that

24    are included?

25              MR. ELLIS:  Objection.  Leading.
```

1          THE COURT:  Sustained.

2    BY MR. RICHARDSON:

3    Q.   Without being able to review the underlying documents,

4    can you verify the accuracy of the numbers claimed on

5    Exhibit 109?

6          MR. ELLIS:  Objection.  Leading.

7          THE COURT:  Overruled.

8          THE WITNESS:  Without any backup or without any

9    financial statements you cannot review any of those numbers

10   or verify them.

11   BY MR. RICHARDSON:

12   Q.   Okay.  Now, are there any other reasons that in making

13   a profits calculation as to Hellenic Rugs you would not or --

14   deduct general and admin claim costs in this instance?

15   A.   Other than the ones I testified about, the incremental

16   and the ability to --

17   Q.   Right.

18   A.   -- review them, verify their accuracy, and look for

19   specific categories.  Other than that, no.

20        MR. ELLIS:  Objection.  Move to strike.

21   Nonresponsive.

22        THE COURT:  Denied.

23   BY MR. RICHARDSON:

24   Q.   Okay.  And now the cost of the goods -- is that a number

25   that we would deduct?

1    A.    Yes.

2    Q.    Okay.   Now, what about the duties and freight?   Would

3    you deduct that number?

4    A.    Normally I would say, yes, you would, but in this case

5    my understanding is the defendants have testified that they

6    haven't allocated it based on any kind of weight or cost or

7    any kind of method.   It's just some sort of allocation that

8    I don't know about.

9    Q.    Okay.

10   A.    So I can't verify whether it's an accurate allocation.

11   Q.    When you're talking about allocation, allocation as to

12   what?

13   A.    Trying to say that this amount of duties and freight

14   relates specifically to the purchase of the $12,402 in rugs.

15   Q.    Okay.   So that's not a number you would include;

16   correct?

17   A.    Based on the data that I've seen, I would exclude it,

18   although it's normally one I would include.

19   Q.    Okay.   Now the cost of sales number, the $620.

20         Is that a number you would deduct?

21   A.    Again, by its definition it's normally a number that I

22   would deduct.   But given that the only thing we have here is

23   a piece of paper, I can't verify it.   I have no idea what it

24   is.   So I can't determine whether it's a valid deduction, no.

25   Q.    Now, if we move to Linen Source, what number did -- or,

1    rather, what calculations did Mr. Strombom go through to

2    arrive at Linen Source's profits?

3    A.   It's in my other report.  Hold on.

4         My understanding is he took the total sales net of

5    returns, which is $2,370.

6    Q.   $2,370.

7    A.   He deducted postage and handling revenue.

8    Q.   Okay.  And you -- let me interrupt one second.  You

9    indicated $2,370 is net of returns?

10   A.   Yes.

11   Q.   Okay.  And then what did he do?

12   A.   He deducted postage and handling revenue of $316.

13   Q.   Anything else?

14   A.   He deducted the $1,102 paid to Hellenic, and he deducted

15   $74 of drop ship charges.

16   Q.   What was that number?

17   A.   $74, which is a subtotal of $1,510.

18   Q.   Okay.  Before we get to the subtotal, let's look at

19   whether his deductions are correct.

20        The amount paid for the goods, the amount paid to

21   Hellenic Rugs -- is that a charge you would agree with?

22   A.   Yes.

23   Q.   Okay.  And you agree with the $2,370 number as well;

24   correct?

25   A.   That's correct.

1    Q.   Now, what about the $316 for postage and handling?

2    A.   I agree with that also.

3    Q.   Okay.  What about the $74 for drop shipping charges?

4    A.   I agree with that also.

5    Q.   What a day.  An agreement among experts.

6              What would the calculations net out to be?

7    A.   $1,510.

8    Q.   And that's a number you would agree with as well;

9    correct?

10   A.   Correct.

11   Q.   Now, I don't believe we netted out the Hellenic numbers.

12             If you take out the calculations that you

13   believe -- or, rather, the deductions you do not believe have

14   been properly supported, what number do you come up with?

15   A.   That would be for Hellenic --

16             Can I move the page?

17   Q.   Yes, for Hellenic.

18   A.   Can you move the page down a second?

19   Q.   Yes.

20   A.   It would be $29,380 minus $12,402, which equals $16,978.

21   Q.   And just so we're clear, the only deduction you allow

22   would be the $12,402 cost of goods; correct?

23   A.   Correct.

24   Q.   So netting that out, you arrive at $16,978 as the total

25   amount that would be the lost profits to Classic if we look

1    to Hellenic's purchases as being the loss?

2    A.   That would be the sales earned or the profits earned by

3    Hellenic.

4    Q.   Excuse me.  I misspoke.  Yes.

5         So the $16,000 is the loss -- or rather the profits

6    earned by Hellenic Rugs on its sales?

7    A.   That's correct.

8    Q.   Now, is it your understanding that if the infringement

9    in this case is found to be willful, are any type of

10   deductions allowed?

11        MR. ELLIS:  Objection.  Calls for a legal

12   conclusion.  Relevance.

13        THE COURT:  Sustained.

14        MR. RICHARDSON:  One moment, your Honor.

15   BY MR. RICHARDSON:

16   Q.   Do you have an understanding as to whether any different

17   calculations would need to be made if the infringement is

18   found to be willful?

19        MR. ELLIS:  Objection.  Vague.  Relevance.  Calls

20   for a legal conclusion.

21        THE COURT:  Sustained.

22        Lay a foundation.

23   BY MR. RICHARDSON:

24   Q.   Mr. Kahrs, have you been called upon to give opinions as

25   to lost profits in copyright cases?

1    A.   Yes, I have.

2    Q.   And do you have a familiarity with the type of

3    deductions that are made in arriving at lost profits?

4    A.   Yes, I do.

5    Q.   And is it your understanding that the type of deductions

6    that are allowed vary depending on whether or not the

7    infringement is determined to be willful?

8    A.   That's my understanding, yes.

9    Q.   What -- how are the calculations different if the

10   infringement is determined to be willful?

11             MR. ELLIS:  Objection.  Relevance.  Vague.  Calls

12   for a legal conclusion.

13             THE COURT:  Overruled.

14             THE WITNESS:  My understanding is that if the

15   infringement is willful --

16             THE COURT:  Excuse me.  One second.

17             However, ladies and gentlemen of the jury, he may

18   be commenting on his understanding, understand that

19   instruction is not an instruction on the law.  You'll get

20   your instructions on the law solely from the Court.  This is

21   simply a calculation based on his understanding.  He is

22   giving a legal instruction.

23             Proceed.

24             THE WITNESS:  Yeah.

25             Again, it's my understanding that in a willful

 1   infringement you would -- the proof of the cost raises the

 2   more willfully infringement, and it could raise to the level

 3   of no deductions that the infringer would have to pay the

 4   sales rep.  That's my understanding.

 5   BY MR. RICHARDSON:

 6   Q.   Okay.  And so if the infringement is found to be

 7   willful, we would look just to the total revenue number;

 8   correct?

 9   A.   Again, that's my understanding, yes.

10   Q.   Okay.  And in that instance as to Linen the number would

11   be $29,380; correct?

12   A.   That's correct.

13   Q.   And as to Linen Source, the total revenue number would

14   be $2,370; correct?

15   A.   Correct.

16        MR. RICHARDSON:  One moment, your Honor.

17        THE COURT:  You may.

18        MR. RICHARDSON:  That's all for this witness.

19        THE COURT:  Thank you.

20        Cross.

21        MR. ELLIS:  May I have a moment, your Honor --

22        THE COURT:  You may.

23        MR. ELLIS:  -- to set up?

24        May I inquire of the witness.

25        Do you have a calculator?

1          THE WITNESS:  I have one on my phone.

2          MR. ELLIS:  May I approach him, your Honor, and

3  give him a good one?

4          THE COURT:  Well, his phone may be a good one.

5          MR. ELLIS:  Are you comfortable using the one on

6  your phone?

7          THE WITNESS:  It may be quicker to use that one.

8          THE COURT:  Okay.  Go ahead.

9          THE WITNESS:  Thank you.

10          MR. ELLIS:  Thank you.

11          May I proceed, your Honor?

12          THE COURT:  You may.

13                        **CROSS-EXAMINATION**

14  BY MR. ELLIS:

15  Q.   Mr. Kahrs, the testimony you've given during this trial

16  regarding the damages of Classic Concepts differs from that

17  which you gave in your report; correct?

18  A.   There are some differences, yes.

19  Q.   Let's go over those differences.

20  A.   Sure.

21  Q.   Now, first working with Hellenic you came up with a

22  number that you felt in your report reflected Hellenic's

23  profits; correct?

24  A.   Correct.

25  Q.   And that number was $14,497; correct?

1    A.   That's correct.

2    Q.   You also came up with a number that you thought

3    reflected Classic's actual damages; correct?

4    A.   Correct.

5    Q.   And that number was $14,690; right?

6    A.   Let me double-check that.

7            Yes.

8    Q.   But because that number was higher than the Hellenic's

9    profits, you just allocated $193 towards Classic's actual

10   damages; right?

11   A.   Correct.  It would be the differential.

12   Q.   So the total amount of damages you calculated before

13   this trial started for Classic Concepts you have already --

14   regarding any claim of infringement regarding Hellenic was

15   $14,690; correct?

16   A.   Correct.

17   Q.   Now, from Linen Source -- you calculated Linen Source's

18   profits to be $1,510; right?

19   A.   Correct.

20           MR. ELLIS:  Am I blocking this?

21           Excuse me, Mr. Soni.

22           MR. SONI:  Not at all.  I'm trying to stay out of

23   your way.

24           MR. ELLIS:  I've got my big side on you.

25   ///

1   BY MR. ELLIS:

2   Q.   Now, with respect to Classic's actual damages in the

3   Linen Source case, you calculated that before this trial

4   began in your report to be $551; right?

5   A.   Correct.

6   Q.   So the total amount of profits you calculated in the --

7        I'd better get my calculator just to make sure I'm

8   right.

9        Let me ask the question again.

10       So the total amount of what you calculated as

11  damages in the Linen Source case as a result of infringement

12  that would be awarded to Classic would be $2,061; right?

13  A.   Correct.

14  Q.   Now let's talk about what you did since this trial

15  began.

16       If I understand you correctly, you are now saying

17  that the total profits in the Hellenic case or that Hellenic

18  got was $13,691; correct?

19  A.   No.

20  Q.   What's this say?

21  A.   That --

22       MR. ELLIS:  Oh, I got it.  My bad.

23       THE WITNESS:  Classics.

24       THE COURT:  Technical legal term.

25  ///

```
 1   BY MR. ELLIS:
 2   Q.   It's higher.
 3             The profits would be $16,978 --
 4   A.   Correct.
 5   Q.   -- correct?
 6   A.   Correct.
 7   Q.   And now the actual damages have jumped by some
 8   7,000 percent to $13,691; correct?
 9   A.   I would not agree with the characterization, no.  The
10   actual -- the damage --
11   Q.   I think you answered the question.  So let's add these
12   up.
13             So now your damage figure is $30,669; is that
14   right?
15   A.   Are you adding those numbers together?
16   Q.   Yeah.
17   A.   The profits of Hellenic plus the actual --
18   Q.   Let me ask the question a little bit differently.
19   A.   Sure.
20   Q.   Is your new damage number $30,679?  Yes or no.
21   A.   No.
22   Q.   What is the new damage figure in your mind?
23   A.   Well, we have different concepts here.  We have the
24   profits earned by Hellenic, which is 16,978 --
25   Q.   Mr. Kahrs, I think if you follow what I'm asking you --
```

UNITED STATES DISTRICT COURT

```
1              MR. RICHARDSON:  Objection, your Honor.

2              At least let the witness answer the question.

3              THE COURT:  No.  He answered the question with the

4    figure.  It's not a hard question.

5    BY MR. ELLIS:

6    Q.   What are the numbers?  Just give us the numbers without

7    the explanation.

8              THE COURT:  You can come back on it.

9              THE WITNESS:  Again, the profits earned by Hellenic

10   are $16,978.  The profits that would have been earned by

11   Classic are $13,691.

12   BY MR. ELLIS:

13   Q.   And what's the total number?

14   A.   If -- to avoid duplication, you would look at the

15   differential between them.  So would you actually subtract

16   them.

17   Q.   Okay.  So what is the number?  The total damage number,

18   as you understand copyright law, as you understand the facts

19   of this case.

20   A.   Under that scenario it would be $3,287.

21   Q.   Is the total?

22   A.   Yes.  It would be the differential between them to be

23   consistent with the report.

24   Q.   Say the number again.

25   A.   Sorry.  I cleared it.
```

1          $3,287.

2    Q.    So your testimony is that the entire damages available

3    to Classic Concepts for infringement by Hellenic is $3,287;

4    is that right?

5    A.    If the jury awards the profits earned by Hellenic and

6    the profits earned by Classic to avoid the duplication, it

7    would be $3,287.  Yes.

8    Q.    Now, if I understand your testimony regarding --

9    A.    I'm sorry.  It would actually be $16,978.  To be

10   consistent, the differential would be added to Hellenic.  To

11   be consistent with my first report, the actual damages -- I'm

12   sorry.  The actual damage number shouldn't be $13,691.  It

13   should be $3,287.  The total should equal the profits earned

14   by Hellenic.

15   Q.    For a second there I thought you were trying to do a

16   fast track and get hired by my firm.

17          So what you're saying is it should go up here?

18   A.    The total -- if you see the comparison --

19   Q.    I know -- I was going to let you make a mistake, but I

20   know what you're saying.

21   A.    $16,978.  I got confused by your presentation there.

22   I'm sorry.

23   Q.    Don't worry.  I was going to clean it up at the end, but

24   let's do it now.

25   A.    Okay.

```
 1    Q.   So now the total damages are what?
 2    A.   $16,978.
 3    Q.   So it's a little messy, but it's not $16,978; right?
 4    You want to add this one and that one; right?  Isn't that
 5    what you want to do?
 6    A.   No.
 7    Q.   You don't want to add these two?
 8    A.   Correct.
 9    Q.   You added these two over here?
10    A.   Correct.
11    Q.   And you don't want to add them over here now?
12    A.   That is correct.
13    Q.   All right.  What is the total damages available in the
14    Hellenic Rug case?  And this is like "Who Wants To Be A
15    Millionaire."  This has got to be your final answer.
16    A.   It's $16,978.
17    Q.   So that's the total?
18    A.   Under that theory, yes.
19    Q.   Well, that's your theory; right?  Your new one?
20    A.   It's the same theory.
21    Q.   It's the new theory?
22    A.   No.  It's the same theory.
23    Q.   Well, this is more than -- this one is more than that.
24    So you changed it; right?
25    A.   Well, as I said, I changed the deductions based on the
```

1    testimony in this trial.

2    Q.   That's not correct.

3    A.   Yes, it is.

4    Q.   No, it isn't.

5            You changed --

6            THE COURT:  Stop arguing, please.

7    BY MR. ELLIS:

8    Q.   You changed the starting number; true?

9    A.   No.

10   Q.   You did not change the starting number?

11   A.   The starting number has always been the sales --

12   Q.   The $29,000 --

13   A.   -- the $29,000 --

14           THE COURT:  Stop for a second.  You're talking over

15   each other, which won't work.  I don't want to hear arguing

16   back and forth.

17           You answer the questions.

18           And you ask questions.

19           MR. ELLIS:  Sure.

20           THE COURT:  Next question, please.

21   BY MR. ELLIS:

22   Q.   Do you have your report in front of you?

23   A.   Yes.

24   Q.   And I'm looking at the Hellenic Rug report?

25   A.   Yes.

UNITED STATES DISTRICT COURT

1    Q.   And at Paragraph 5 you say Hellenic Rug Imports imported

2    these goods from India, had purchased them from Classic

3    Concepts.  Classic Concepts would have earned the margin.

4            That's what you said; right?

5    A.   Correct.

6    Q.   And if Hellenic had been purchasing these from Classic

7    instead of India, we would have been looking at what Surya

8    sold them for; right?

9    A.   Correct.

10   Q.   But you didn't do that, did you, in your report?

11   A.   That's a different calculation, yes.

12   Q.   Well, you didn't do that in your report even though you

13   said that we should look at what they sold it for from India

14   from; right?

15   A.   That's correct.

16   Q.   And so you are correct that you always did use the

17   $29,000 number but -- but you did that wrong, didn't you,

18   because you didn't look at Surya's numbers?

19           You never looked at Surya's numbers -- at what

20   Hellenic bought them for; correct?

21   A.   I did not look at Surya's numbers in our report.

22   Q.   All right.  Now, your total damages in Hellenic's case,

23   as you sit here today, is $16,978; correct?

24   A.   That's the profits that Hellenic Rugs earned, yes.

25   Q.   What is the total -- the total amount of damages that is

1    available to the plaintiff as their expert -- as their paid

2    expert that they can get if they win?  What is the number?

3    A.   My understanding is they would be entitled to -- the

4    profits that Hellenic earned -- depending on the willfulness,

5    they may or may not be able to deduct costs.  So it could be

6    as high as $29,380.  If you deduct the cost, the profits that

7    Hellenic earned are $16,978.

8    Q.   And under this scenario -- your new scenario, you

9    wouldn't include this amount; correct?

10   A.   The profits that Classic would have earned would be less

11   than that.  So to avoid duplication, you would not add them

12   together.  It would just be the total.

13   Q.   All right.

14   A.   Then we still have the cost issue, the Surya cost issue.

15   Q.   Okay.  Now let's go to Linen Source.

16           Now, for the profits you did remain consistent, and

17   it's still $1,510; right?

18   A.   Correct.

19   Q.   And for the actual -- it is now $1,104, where it was

20   $551; right?

21   A.   Correct.

22   Q.   And in this particular instance, one of the changes is

23   that you began with the new starting number; right?

24   A.   That's correct.

25   Q.   And the original starting number that you began with in

1    your report -- you actually came up with that theory with

2    Mr. Soni; correct?

3    A.    That's correct.

4    Q.    And you guys sat down talked about it, vented it out,

5    and decided that the theory that you employed at the

6    beginning to look at what Linen Source paid to Hellenic was

7    correct; correct?

8    A.    That was correct based on our discussions at that time.

9    Q.    But since this trial has started, you changed that

10   approach, and now you are looking at what Linen sold the

11   products for; right?

12   A.    That's correct.

13   Q.    Well, I assume that was also due to a discussion with

14   Mr. Soni; correct?

15   A.    Actually, it was a discussion with Harpal.

16   Q.    Oh, so Mr. Soni wasn't there when you were talking to

17   his client about the changes you were going to make in the

18   testimony today?

19   A.    He was there also, yes.

20   Q.    Okay.  So he was co-signer, so to speak, as to the

21   changes you were going to make in your report that were going

22   to increase the actual damages by 200 percent; right?

23   A.    About $500, yes.

24   Q.    200 percent.

25         You were -- you went to Cal State Fullerton like

1    me.  You can add that up that quickly, can't you?

2    A.    It would be 100 percent increase.

3    Q.    All right.  Now, if I understand this correctly, in this

4    particular case you have now -- what is this -- well, let me

5    ask this.

6              What is the total number for the Linen Source case

7    as you understand it?

8    A.    It would be $2,000 -- $2,614.

9    Q.    So from your report to your testimony here today, you've

10   increased damages by as little as $2,000 or so dollars;

11   right?

12   A.    Correct.

13   Q.    And you've increased them by as much as $15,000 if

14   there's no deductions made; correct?

15   A.    Correct.

16   Q.    And for the Linen Source case you've increased damages

17   by, oh, $600?

18   A.    Roughly, yes.

19   Q.    And, in total, your testimony here today is different

20   than it was in your report that you signed and submitted

21   under penalty of perjury; right?

22   A.    There were some changes, yes.

23   Q.    And the differences in that report were the result of a

24   conversation you had with Mr. Singh and Mr. Soni; right?

25   A.    Correct.  And some testimony in this trial.

UNITED STATES DISTRICT COURT

1    Q.    Now, when you were doing all this to change your
2    opinions, did you at any time talk to Mr. Singh about his
3    production capabilities during the time that the defendants
4    sold their products?
5    A.    Yes.
6    Q.    Was that after the trial or before?
7    A.    It was during.
8    Q.    So you never discussed with Mr. Singh his production
9    capabilities until this trial actually began?
10   A.    With Mr. Singh, no.
11   Q.    You only talked to Mr. Soni about those issues?
12   A.    Yes.
13   Q.    And as you said at your deposition, he just assured you
14   that there could have been a production of the additional
15   rugs; right?
16   A.    Yes.
17   Q.    Now, did you ever review Mr. Singh's testimony and hear
18   him say how all of Panipat was making his rugs on every
19   available loom in the country?
20   A.    I did not review his testimony, no.
21   Q.    Oh, so your opinions do not take into consideration that
22   Mr. Singh said that every single loom in Panipat was being
23   woven with his rug up and down the streets, under sheds,
24   where everybody could come and look at it and see it.
25         You didn't consider that, did you?

UNITED STATES DISTRICT COURT

```
 1   A.   Well, again, I discussed with him where he said he could
 2   make these sales.
 3             MR. ELLIS:  Move to strike as nonresponsive.
 4             May I have the question back, your Honor?
 5             THE COURT:  Well, hold on.  Let me rule on the
 6   motion first.
 7             The motion is granted.
 8             The reporter please repeat the question.
 9             (The record was read.)
10   BY MR. ELLIS:
11   Q.   Yes or no?
12   A.   I did not consider that statement, no.
13   Q.   Now, we could agree, can we not, that there's no damages
14   to plaintiff unless the plaintiff can prove that they could
15   actually make the rugs for sale; right?
16   A.   There would just be the profits earned by the infringer.
17   Q.   Right.
18             For the actual damage to the plaintiff, they would
19   need to prove that they could actually make the rugs.  True
20   or false?
21   A.   That's -- my understanding is that that's true.
22   Q.   And if they could not make the rugs, if they were so
23   occupied in making other items, then there wouldn't be no
24   actual damage to the plaintiff; right?
25   A.   That's my understanding, yes.
```

UNITED STATES DISTRICT COURT

1    Q.   Now, you know that the plaintiff had not these rugs

2    since about 2000; right?

3    A.   I'm not aware of the last time they produced them, no.

4    Q.   Well, during your conversations with Mr. Singh, didn't

5    he tell you that he stopped selling his Diamond Kilim rugs to

6    Pottery Barn in or about February, 2000?

7    A.   I don't recall the exact date, but I remember that he

8    was selling them to Pottery Barn, and then he stopped, yes.

9    Q.   And the -- during the period of time that the defendants

10   were selling their products, Classic Concepts wasn't even

11   selling the rug; correct?

12   A.   That's my understanding, yes.

13   Q.   They were only selling the pillow and the ottoman to

14   Crate and Barrel; true?

15   A.   That's my understanding.

16   Q.   And they hadn't in many years even produced the rug;

17   correct?

18   A.   Not that I know of.  Correct.

19   Q.   So you've increased your damages in this case based on

20   a conversation with Mr. Singh and Mr. Soni; right?

21   A.   That's correct.

22   Q.   But during that conversation you never once asked a

23   question or verified that despite the fact that plaintiff

24   hadn't produced a rug in seven years, they could have made

25   the rugs during the period of time the defendants were

1    selling their goods; right?

2    A.    That's incorrect.  I did ask Mr. Singh about it.

3    Q.    And you just took his word for it; right?

4    A.    It's my understanding he said he could do that, yes.

5    Q.    Well, I'm trying to figure out how that's consistent

6    with the fact that you testified that he couldn't take

7    Hellenic's word for it on Exhibit 109, when they gave their

8    general administration costs.

9          Can you explain that for me, Mr. Kahrs?

10   A.    Sure.

11         I think the concept of production ability would be

12   something that would come from the owner of the company.  I

13   think an accounting document versus a piece of paper -- there

14   would be back up and accounting work that would be very

15   simple and easy to produce that you could verify.

16   Q.    So inventory production schedules, those aren't

17   something that are easy to produce?  Yes or no.

18   A.    Yes, they would be.

19   Q.    But in this particular instance you just took

20   Mr. Singh's word for it without asking for any of those

21   things; right?

22   A.    I asked him if he could make the rugs.  He said yes.

23   Q.    And that was it.

24         You didn't ask for anything else to verify that

25   statement; isn't that right?

1    A.   That's correct.

2         MR. ELLIS:  Thank you, your Honor.

3         I have nothing further.

4         THE COURT:  Thank you.

5         Redirect.

6         MR. RICHARDSON:  Yes, your Honor.

7         THE COURT:  Actually, before we start we'll take

8    our morning break.

9         MR. RICHARDSON:  Okay.

10        THE COURT:  Resume in 15 minutes.

11        Please do not discuss the case among yourselves or

12   with anybody else.  Please do not form any opinion.

13        Thank you.

14        (Whereupon, the jury exited the courtroom at

15        10:30 a.m.)

16        (A break was taken at this time from 10:30 a.m. to

17        10:51 a.m.)

18        (Whereupon, the jury entered the courtroom at

19        10:51 a.m.)

20        THE COURT:  All right.  Please be seated.

21        Back on the record.

22        The jurors are all present.  Counsel are present.

23        And Mr. Richardson, you may proceed.

24        MR. RICHARDSON:  Thank you, your Honor.

25   ///

1                        **REDIRECT EXAMINATION**

2   BY MR. RICHARDSON:

3   Q.    Mr. Kahrs, Mr. Ellis made much of the fact that your

4   number here from your report, the profit number for Hellenic,

5   is different than the $16,978 that you arrived at earlier

6   today.

7            Why was this number different today?

8   A.    The difference between the number in my report and the

9   number today is the deduction of the cost of duties and

10  freight and the other number called cost of sales.  And

11  initially I had deducted those as proper expenses, but my

12  understanding is the testimony in this case was that there

13  was never by the defendants a proper allocation method.  And

14  since I don't have any of the backup, I can't test that

15  allocation.  So I just didn't deduct it.

16  Q.    Okay.  So if we look back at the rough notes I made

17  earlier that we marked as Exhibit 155, the numbers you're

18  talking about are these two numbers here?

19  A.    That's correct.  $1,862 --

20  Q.    Now, Mr. Ellis also made much of the fact that the

21  number you arrived at today, the $2,614, is a little bit

22  higher than the number you arrived at in your report.

23            Did the methodology between what you testified to

24  or wrote out in your report differ any than the way we

25  arrived at the numbers here today?

1    A.   The methodology is the same.  It was just applied to a

2    different sales number.

3    Q.   Okay.  And the sales number you used to arrive at the

4    numbers in your report as to Linen Source were what?

5    A.   The sales made by Hellenic to Linen Source.

6    Q.   And, in fact, those are the numbers we walked through

7    earlier today in what I've marked as 154; correct?

8    A.   That's correct.

9    Q.   And the other method that we walked through the other

10   day and again today on Exhibit 153 -- what are the

11   differences between the two?

12            MR. ELLIS:  Objection.  Cumulative.  Beyond the

13   scope.

14            THE COURT:  Overruled.

15            THE WITNESS:  I didn't understand.

16            The differences between --

17   BY MR. RICHARDSON:

18   Q.   Well, let's put them side by side.

19            We did two different calculations as to Linen

20   Source.

21   A.   Right.  Yeah.

22            The only differences is which number you apply the

23   margin to, which sales figure.

24   Q.   Okay.  And the one on the left here -- what number are

25   you using?

A.   $2,370, which is the sales Linen Source made to its

customers.

Q.   So that's looking at -- if the infringement -- we're

going to measure it by the sales made to Linen Source's

customers; correct?

A.   Correct.

Q.   And then another methodology we see on the right-hand

side -- what are those sales?

A.   Those are the sales to Linen Source.

Q.   So if the lost sales is if Classic Concepts had made the

sales to Linen Source; correct?

A.   If -- if that's the measure of damages, then I've done

the calculation, yes.

Q.   Okay.  Now, do you decide which method is the proper

method?

A.   No.

Q.   Who gets to decide that?

A.   That would be the jury, it's my understanding.

Q.   And what we've done here is provide the numbers,

whichever way the jury decides to look at them; correct?

A.   Correct.

          MR. RICHARDSON:  No further questions, your Honor.

          THE COURT:  Thank you.

          Recross?

          MR. ELLIS:  Yes, your Honor.

1                        **RECROSS-EXAMINATION**

2     BY MR. ELLIS:

3     Q.   Now, you said that the only change here was that you

4     deducted items that you feel were not supported; is that

5     right?

6     A.   On the Hellenic's profits numbers, yes.

7     Q.   And that's not true; right?

8     A.   It is true.

9     Q.   No, it isn't.

10          You said that the margin you used here was

11    46.6 percent; right?

12    A.   On the Classic's --

13    Q.   Well --

14    A.   That's Hellenic's profits, not Classic's profits.

15    Q.   Well, on the Hellenic profits, what number did you times

16    it by?

17    A.   Well, actually, I used the purchase invoice and the

18    other information on exhibit -- is that 109?

19    Q.   Right.

20    A.   Yes.

21          So I didn't do any multiplication on the Hellenic's

22    products.

23    Q.   Sure.

24          Now, what did you do was in your first analysis you

25    did take out general overhead; right?

1    A.    Correct.

2    Q.    And you -- this time you took out duties and freight;

3    right?

4    A.    I did not take out duties and freight.  The first

5    time -- in my report I did, but based on what I have learned

6    since then, I would not take it out.

7    Q.    Right.

8          And you know that there is duties and freight paid;

9    right?

10   A.    I know there is, but I don't know the amount.

11   Q.    And you know it could be higher than the estimate that

12   Hellenic did on 109; right?

13   A.    I would be speculating, but it could be, yes.

14   Q.    And it could be lower; right?

15   A.    It could be, yes.

16   Q.    But you just didn't allocate anything for that; right?

17   A.    I have no basis to allocate it.

18   Q.    Is that a yes?

19   A.    Can you read back the question, please.

20         THE COURT:  No.

21         You answered it.

22         Are you saying you don't understand the question?

23   Do you want it read back?

24         THE WITNESS:  I thought I did answer it by saying

25   I had no basis to allocate it.

```
 1              THE COURT:  The --
 2              MR. ELLIS:  Can I try again, your Honor?
 3              THE COURT:  Try again.  Rephrase it.
 4     BY MR. ELLIS:
 5     Q.   Now, try to focus on my question, Mr. Kahrs.
 6     A.   Okay.
 7     Q.   You know that there are duties and freights that would
 8     be paid in some amount; correct?
 9     A.   Correct.
10     Q.   And you place no amount towards that; correct?
11     A.   Correct.
12     Q.   Although you did in the first instance; right?
13     A.   Correct.
14     Q.   And your decision to place no value towards that is a
15     result of your conversations with Mr. Singh and Mr. Soni;
16     right?
17     A.   Yes.
18     Q.   Now, with respect to actual profits, Mr. -- you said
19     that the only change here was that you began with a new
20     starting number; right?
21     A.   No.  The only change in the actual profits is the
22     margin.
23     Q.   Okay.
24     A.   50 to 46.6.
25     Q.   So you did change your methodology with respect to
```

1   margin; right?

2   A.   It's a same methodology, different margin.

3   Q.   Well, you say, "tomato"; I say, "tomato."

4        You didn't use the same number to calculate the

5   margin; right?

6   A.   I multiplied it towards the same number.

7   Q.   Well, I know multiplication remains the same no matter

8   if you times it by 50 percent or 46.6 percent.  But what I'm

9   trying to get at is that did you change a number in your

10  analysis that would be used to calculate actual profits; is

11  that right?

12  A.   Yes.

13  Q.   Now, for Linen Source you did change the starting

14  number; right?

15  A.   Yes.

16  Q.   And that's with respect to the actual profits?  You used

17  the higher starting number; right?

18  A.   To calculate Classic's profits, yes.

19  Q.   And that's what I -- you understood that to mean when

20  I said your actual damage number you used the higher starting

21  number?

22        You understood that?

23  A.   Yes.

24  Q.   And you also used a different margin when you calculated

25  the profits; right?

```
 1    A.   Correct.

 2    Q.   And in doing all of that, the number that you've come up

 3    with is now higher; right?

 4    A.   Yes.

 5    Q.   And in doing all that you did with respect to Hellenic,

 6    the number is now higher; right?

 7    A.   Correct.

 8    Q.   Thank you.

 9              MR. ELLIS:  Nothing further, your Honor.

10              THE COURT:  Thank you.

11              Redirect?

12              MR. RICHARDSON:  Yes, your Honor.  Just a couple of

13    questions.
```

14                    **FURTHER REDIRECT EXAMINATION**

```
15    BY MR. RICHARDSON:

16    Q.   Now, what percentage of -- or margin did you use in your

17    report?

18    A.   50 percent.

19    Q.   And in doing the numbers that we have done here today

20    and the other day, what margin did you use?

21    A.   46.6 percent.

22    Q.   Why the change?

23    A.   Well, initially my 50 percent margin was based on

24    conversations with Mr. Soni.  I had actually also looked at

25    Hellenic's margin, which comes out to 49.34 percent; so it
```

1  seemed pretty close.  It seemed within industry standards.

2  And on a, you know, $30,000 damage number, I didn't think

3  there was a large margin for error.  I since saw a financial

4  statement which reflected a 46.6 percent number.  So I used

5  the actual rather than the estimate.

6  Q.   Well, isn't the 46.6 percent number the number that was

7  used by Mr. Strombom?

8           MR. ELLIS:  Objection.  Leading.

9           THE COURT:  Overruled.

10          THE WITNESS:  Yes.

11 BY MR. RICHARDSON:

12 Q.   And so for the sake of argument and -- rather, to avoid

13 argument, you reduced the number from which your original

14 calculation was at 50 percent and simply used the number that

15 the defendant's own expert used; correct?

16          MR. ELLIS:  Objection.  Leading.

17          THE COURT:  Overruled.

18          THE WITNESS:  Yes.

19          MR. RICHARDSON:  No further questions, your Honor.

20          THE COURT:  Thank you.

21          Anything further?

22                   **FURTHER RECROSS-EXAMINATION**

23 BY MR. ELLIS:

24 Q.   So I take it then you agree with Mr. Strombom on that

25 point; right?

```
 1    A.    On the margin at being 46.6 percent, yes.

 2              MR. ELLIS:  Nothing further, your Honor.

 3              THE COURT:  All right.  Anything further?

 4              MR. RICHARDSON:  Nothing further, your Honor.

 5              THE COURT:  Defense?

 6              MR. ELLIS:  Nothing, your Honor.

 7              MR. STOVER:  Nothing, your Honor.

 8              THE COURT:  No further rebuttal?

 9              MR. ELLIS:  No, sir.

10              THE COURT:  All sides rest?

11              MR. RICHARDSON:  Nothing with this witness, you

12    mean?

13              THE COURT:  Oh, you have another rebuttal witness?

14              You hold on.

15              Everybody finished with this witness?

16              MR. SONI:  We're all finished with this witness.

17              THE COURT:  The witness is excused.

18              Thank you.

19              THE WITNESS:  Thank you.

20              THE COURT:  Mr. Singh?

21              MR. SONI:  Mr. Harpal Singh to the stand, your

22    Honor.

23              THE COURT:  Mr. Singh, you understand you already

24    have been sworn; you are still under oath?

25              THE WITNESS:  Yes, sir.
```

1          THE COURT:  Okay.  Have a seat.

2                    **HARPAL SINGH,**

3     called as a witness by counsel for the plaintiff being first

4                duly sworn, testified as follows:

5                    **DIRECT EXAMINATION**

6     BY MR. SONI:

7     Q.   Good morning, Mr. Singh.

8     A.   Good morning.

9     Q.   Were you in the courtroom when Mr. Rogakos testified,

10    sir?

11    A.   Yes, sir.

12    Q.   Do you remember Mr. Rogakos indicating that -- or

13    testifying about the number of catalogs Pottery Barn puts out

14    in a year?

15    A.   Yes, sir.

16    Q.   Is your understanding about the number of catalogues put

17    out by Pottery Barn different than Mr. Rogakos's testimony?

18              MR. ELLIS:  Objection.  Leading.

19              THE COURT:  Sustained.

20    BY MR. SONI:

21    Q.   Do you have an understanding of how many catalogs

22    Pottery Barn puts out in a year?

23    A.   Yes, sir.

24    Q.   How do you know that?

25    A.   Through my regular interactions with the buyers at the

1    Pottery Barn, through my visits to them every few weeks,

2    through the catalogs I receive in the mail all the time, with

3    the fact that I've been working with them for the last

4    17 years.

5              THE COURT:  Slow down, please.

6              THE WITNESS:  For the last 17 or 18 years.

7    BY MR. SONI:

8    Q.   And how many catalogs does Pottery Barn put out in a

9    year?

10             MR. ELLIS:  Objection.  Cumulative.  Case-in-chief.

11             THE COURT:  Overruled.

12             THE WITNESS:  At the very minimum 12 or more.

13   BY MR. SONI:

14   Q.   And do you know what catalogs they do put out in a year?

15   A.   Yes, sir.

16             MR. ELLIS:  Objection.  Foundation.

17             THE COURT:  Sustained.

18   BY MR. SONI:

19   Q.   You receive the catalogs from Pottery Barn?

20   A.   Yes, sir.

21   Q.   Do you receive catalogs from Pottery Barn seasonally?

22   A.   Yes, sir.

23   Q.   How many catalogs does Pottery Barn put out in the

24   spring?

25   A.   In the spring there was a minimum of three catalogs.  It

```
1   starts with an early spring, followed by spring, followed by
2   late spring.
3   Q.   Is -- and how many catalogs does Pottery Barn put out in
4   the summer?
5   A.   It's the early summer catalog.  Then there's a different
6   cover in the spring -- sorry.  In the summer that's followed
7   by late summer.
8   Q.   And is it -- how many does Pottery Barn put out in the
9   fall?
10  A.   They start with early fall, and they follow that up with
11  fall, and then there's an autumn catalog.
12  Q.   And what do they do in the winter?
13  A.   They have early winter; they have winter; and they have
14  late winter.
15  Q.   Now, are you -- do you understand the concept of
16  inventory balancing?
17  A.   Yes, sir.
18  Q.   What do you understand that to mean?
19  A.   Well, for example, a company -- if it's a catalog in a
20  retail store and they buy inventory for both the divisions,
21  when it comes closer to the life cycle, the end of the life
22  cycle of a product -- they analyze the inventory.
23          And if one -- for example, if the retail store has
24  greater inventory than the catalog, then the catalog ends up
25  ordering -- getting inventory from the retail store.  So they
```

1    end -- so the situation is they don't end up with, A, either

2    ordering the inventory or discounting the inventory at the

3    end of the season.

4    Q.   And do you -- in your experience and dealings with

5    Pottery Barn, does Pottery Barn employ inventory balancing?

6    A.   Yes, sir.  When they carry a product in the retail

7    stores and in the catalogs closer to the end of life cycle,

8    this happens all the time.

9    Q.   So inventory might be moved from the retail to the

10   catalog to satisfy demand?

11   A.   Or vice versa, yes, sir.

12   Q.   Now, in your sales -- in Classic Concepts sales to its

13   customers, do you charge your customers for shipping?

14   A.   No, sir.

15   Q.   And in connection with your reported sales numbers, do

16   you include any shipping income in your total sales?

17   A.   No.  If we don't charge them for shipping, we don't

18   report it in the numbers.

19   Q.   And if you do charge them for shipping, do they pay for

20   that separately?

21   A.   Yes, sir.

22   Q.   Does Classic Concepts incur sales commissions in

23   connection with the sales of the Diamond Kilim rugs?

24   A.   No.  There were no commissions involved since I was the

25   contact person for Diamond Kilim rugs.

1   Q.   In the year 2003, sir, would Classic Concepts have been

2   able to produce 482 rugs in the Diamond Kilim rug design?

3   A.   Absolutely, sir, because we have been raising our

4   production capacity since the mid '90s, and we have plenty of

5   capacity -- we had enough capacity in 2003 that we had

6   started building up in the mid '90s to be able to cater to

7   the need of 400 audience.

8   Q.   In the time period that was allowed for delivery by

9   Surya on the orders placed by Hellenic, could your company

10  have produced the Diamond Kilim rug designs for Hellenic if

11  they were ordered from you?

12  A.   Yes, sir.

13          MR. SONI:  No further questions.

14          THE COURT:  Thank you.

15          Recross?

16          We can move that easel, unless you're going to use

17  it.

18          Thank you.

19                      **CROSS-EXAMINATION**

20  BY MR. ELLIS:

21  Q.   You're not trying to --

22          MR. ELLIS:  May I proceed, your Honor?

23          THE COURT:  Yes.

24  BY MR. ELLIS:

25  Q.   You're not trying to say that inventory normalization is

1    what explains the fact that your Exhibit 46 shows 4,000 sales

2    to the Pottery Barn retail as opposed to 700 sales to the

3    catalog, are you?

4             MR. SONI:  Leading and mischaracterizing the

5    evidence.

6             THE COURT:  Leading?

7             MR. SONI:  Leading and mischaracterizes the

8    evidence, your Honor.

9             THE COURT:  This is cross.

10            MR. SONI:  This is cross.  It's --

11            THE COURT:  Overruled.

12            THE WITNESS:  Could you please repeat the question.

13   I'm not sure I understood it.

14   BY MR. ELLIS:

15   Q.   Let me try again.  You're not saying that inventory

16   normalization that just talked about with Mr. Soni explains

17   why Pottery Barn retail ordered 4,000 of the Diamond Kilim

18   products as opposed to Pottery Barn catalog, which ordered

19   only 700, are you?

20   A.   I'm still not understanding the question actually.

21   Q.   Well, Mr. Singh, let me ask you like this.

22            Is inventory normalization the reason why your

23   company only sold 700 products to the catalog.

24   A.   Our company sold product to Pottery Barn based on their

25   needs.  I cannot make a judgment on the rest of the details.

1   Q.   Well, you're the CEO of the company; correct?

2   A.   Yes, I am.

3   Q.   You're the one that testified that your products

4   appeared in the catalog 18 separate times; right?

5   A.   Yes, sir.

6   Q.   And based on that, didn't you take any inventory --  any

7   attempt before you came to testify to this jury to determine

8   how many specific products you sold through the catalog?

9            MR. SONI:  Argumentative.  Beyond the scope.

10            THE WITNESS:  No.

11            THE COURT:  Overruled.

12            THE WITNESS:  No.

13  BY MR. ELLIS:

14  Q.   You didn't do that, did you?

15  A.   No.

16  Q.   Now, you say that you could have produced the products

17  that were sold by Hellenic in Linen Source.

18            Am I understanding your testimony correct?

19  A.   Yes.

20  Q.   But you also testified in your case-in-chief on direct

21  examination that it was a huge burden to make that first

22  2,000 order for Pottery Barn; right?

23  A.   In 1998 it was.

24  Q.   And you said that you had to find every available loom

25  to have various people produce those rugs; right?

1    A.    Absolutely.

2    Q.    And when Hellenic and Linen Source were selling their

3    products in 2004, you were selling the pillow and the ottoman

4    at Crate and Barrel; right?

5    A.    Not in 2003 -- yes, I was.

6    Q.    You were selling to Crate and Barrel; right?

7    A.    Yes, sir.

8    Q.    Now, you sold 5,000 of those items; right?

9    A.    Yes, sir.

10   Q.    And the 482 sold by Hellenic would have been an

11   additional amount that you would have had to have sold;

12   right?

13   A.    Yes.

14   Q.    And when you were at Pottery Barn and you were dealing

15   with the Diamond Kilim rugs, you were producing other

16   products for Pottery Barn; right?

17   A.    Yes, sir.

18   Q.    And that placed a burden on you as well to try to meet

19   the orders for Pottery Barn for the Diamond Kilim rugs and

20   also to produce the other products you were selling to

21   Pottery Barn; right?

22   A.    That is correct.

23          THE COURT:  Mr. Ellis, could you slow down on your

24   questions too, please.

25          MR. ELLIS:  Sure.

1           Now, I would like to publish Exhibit 5, your Honor.

2           THE COURT:  You may.

3           MR. ELLIS:  It's in?

4           THE COURT:  I believe it's in.

5           MR. ELLIS:  And on Page 5 --

6           THE COURT:  That's it.

7           MR. ELLIS:  And on the left I would like to have

8      Page 57 of that document.

9           MR. SONI:  Could we have the Bates number on that.

10          MR. ELLIS:  Mr. Stover -- may I ask counsel for

11     that, your Honor.

12          THE COURT:  Yes.

13          Mr. Stover, what's the Bates number?

14          MR. STOVER:  Your Honor, I believe the Bates number

15     should be CC00338.

16          THE COURT:  That appears correct.

17     BY MR. ELLIS:

18     Q.   That Page 57 of Exhibit 5 is a picture of the Diamond

19     Kilim rug; correct?

20     A.   Yes, sir.

21          MR. ELLIS:  Now, if I could publish, your Honor,

22     Pages 70 and 71.

23          On the left and right page, Mr. Stover, of the same

24     exhibit.

25          THE COURT:  Give us that Bates number again,

```
 1    please.
 2              MR. STOVER:  Your Honor, Bates number on Page 70 of
 3    Exhibit 5 should be CC00351 followed by Bates number --
 4              THE COURT:  352?
 5              MR. STOVER:  -- 352.
 6              MR. ELLIS:  May I publish, your Honor?
 7              THE COURT:  You may.
 8    BY MR. ELLIS:
 9    Q.   Mr. Singh, this Diamond -- this rug that's in the
10    Pottery Barn catalog is another one of your rugs, isn't it,
11    sir?
12    A.   Yes, sir.
13    Q.   What's it called?
14    A.   I believe it's called the Red Bull Kilim.  I'd have to
15    check the name of what this is called.  It was several years
16    ago.
17    Q.   Well, let's blow it up and see if we can help you.
18              Now, this isn't a rug that you copyrighted; right?
19    A.   No.
20    Q.   And this isn't a rug that you saw being sold by Pier 1;
21    right?
22    A.   No.
23    Q.   But you did make a number of these red wool rugs for
24    Pottery Barn and sold them to them; right?
25    A.   Yes, sir.
```

1   Q.   And you made all those during the same period of time

2   that you were selling your Diamond Kilim products; right?

3   A.   Yes, sir.

4           MR. ELLIS:  Now, if I could have Mr. Stover on the

5   left Page 71, and on the right Page 27 of Exhibit 46.

6           And if you could assist the Court -- Page 27.  If

7   you could assist the Court with the Bates number on that

8   document, I would appreciate it.  I believe it's depicted on

9   the screen as well, Mr. Stover.

10          MR. STOVER:  It appears to be Bates Number CC00497.

11          MR. ELLIS:  If I could highlight the body of that

12  document, Mr. Stover.

13  BY MR. ELLIS:

14  Q.   Now, this is one of your PO's that you received from

15  Pottery Barn; correct?

16  A.   Yes, sir.

17  Q.   And the Diamond Kilim is depicted on this -- on this PO;

18  right?

19  A.   Yes, sir.

20  Q.   And the red wool is depicted on this PO; right?

21  A.   Yes, sir.

22  Q.   And it appears to me that you sold at this point in time

23  110 Diamond Kilims on this PO and 77 red wools; right?

24  A.   If that is accurate.  I cannot cite numbers very

25  clearly, but if that is what is stated, then that would be

1    true.

2    Q.   And this is during the period of time when all of

3    Panipat was making the Diamond Kilim rugs?

4    A.   Yes, sir.

5    Q.   And I assume that there must have been somebody that was

6    making the red wool rugs; right?

7    A.   I think it's mischaracterized when you say that all of

8    Panipat was making all of our rugs.  I didn't say only

9    Diamond Kilim rugs.

10   Q.   Oh, huh.

11   A.   And I also said that --

12   Q.   Hold on.

13        THE COURT:  There's no request question pending.

14   BY MR. ELLIS:

15   Q.   Hold on.  Let me make sure I get this one.

16        Now, if I'm correct, you're telling me that it

17   wasn't that all up and down the streets, under sheds people

18   were making your specific Diamond Kilim rugs, which is

19   Exhibit 1.

20        They were making all of your rugs; right?

21   A.   My testimony was we were making several.

22   Q.   Yes or no, Mr. Singh?

23   A.   My testimony was we were --

24   Q.   Yes or no, Mr. Singh?

25   A.   If you would please repeat the question.

1    Q.   I will try.

2            Now what you're telling me is -- is that it's not

3    that all of Panipat was lined up and down the streets, under

4    sheds making only your Diamond Kilim design.  They were

5    making all of your rugs; correct?

6    A.   Kilim rugs.

7    Q.   Now --

8            THE COURT:  You have to jump in there, Mr. Soni.

9            Proceed.

10   BY MR. ELLIS:

11   Q.   If you were Mr. Mazarakis traveling to Panipat walking

12   up and down the street, you wouldn't have only seen people

13   weaving your Diamond Kilim rugs, you would have seen them

14   weaving the red wool rug; right?

15   A.   They could have seen anything.  I cannot judge what they

16   would have seen.

17   Q.   Is that a yes?

18   A.   My answer is they could have seen anything.

19   Q.   So -- wait, wait, wait.

20           Did you just say you couldn't judge what they would

21   see?  So is it correct that you can't judge whether or not

22   they ever saw your Diamond Kilim rug?

23   A.   I can't make that judgment.

24   Q.   So you're not saying that they ever specifically saw

25   your Diamond Kilim rug; right?

1    A.   I'm not making that judgment.

2    Q.   And you're not specifically saying that anybody ever saw

3    your red wool rugs; right?

4    A.    Unless I was there looking at them looking at my rugs,

5    I cannot make that judgment.

6    Q.    And so you're not saying that Mr. Chaudhary saw your

7    Diamond Kilim rug; right?

8    A.    I'm not saying anything.

9    Q.    And you're not saying that Mr. Chaudhary ever witnessed

10   your Diamond Kilim rugs being made in Panipat; right?

11   A.    If Mr. Chaudhary was in Panipat as this production was

12   being made and if it was in the field of making these kind of

13   rugs, he had to have seen these rugs.

14   Q.   Well, see, I've got to get it right because I think you

15   just told me something different.

16          I thought you just said that unless you were there

17   and you saw him looking at it, you couldn't say whether or

18   not they saw them there; is that right?

19          MR. SONI:  Asked and answered.

20          THE COURT:  Overruled.

21          THE WITNESS:  I beg your pardon?

22   BY MR. ELLIS:

23   Q.   Mr. Singh, unless you were specifically watching

24   somebody view your rug, you couldn't say one way or another

25   whether they ever saw it; right?

```
 1    A.   Well, unless I'm watching somebody do it, I cannot say.

 2    Q.   And you never were watching Mr. Chaudhary review your

 3    Diamond Kilim rug; right?

 4    A.   No.

 5    Q.   And you never were watching Mr. Mazarakis review your

 6    Diamond Kilim rug; right?

 7    A.   No.

 8    Q.   And you never were watching Mr. Rogakos review your

 9    Diamond Kilim rug; right?

10    A.   No.

11    Q.   And you never were watching Mr. Grant review your

12    Diamond Kilim rug; right?

13    A.   No.

14         MR. ELLIS:  Can I have Exhibit 46, Page 67,

15    directly in the middle.

16         And if you could blow up, Mr. Stover, the top right

17    that refers to entry date.

18    BY MR. ELLIS:

19    Q.   When was this particular PO placed with your company,

20    Mr. Singh?

21    A.   I would believe this was on 1-25-99, from what I can

22    see.

23    Q.   And if you could go back to the original document and

24    highlight the part that says order completed.

25    A.   It says 9-24 of '99.
```

1    Q.    And that's when your company completed production and

2    shipped the Diamond Kilim rugs that are called for under this

3    invoice; right?

4    A.    I would imagine, if that's what it says.

5    Q.    And it took you eight months to complete this purchase

6    order; right?

7    A.    Again, I -- I have to look at what the ship date was,

8    and based on that I can look at that.  Sometimes the PO's are

9    placed and you have long windows.  I'm not aware of that.

10   Q.    Well --

11   A.    I would have to look at those -- the information again

12   on that.

13   Q.    Well, my question is a little bit simpler than that.

14          If it was taking you eight months to produce the

15   Diamond Kilim rugs, what in the world makes you think that

16   you could have complied with Hellenic's time frame with

17   respect to the rugs they were getting from Surya?

18   A.    Five years time frame; number of looms that we had

19   created; production capacity.  In 1997, 1998, we had

20   extensive need for production.  We were training weavers.

21          THE COURT:  Slow down, please.

22          THE WITNESS:  We were training weavers.  We were

23   creating more looms.  We were working with the demand.  Based

24   on this demand, you know, the production capacity increased.

25   And in 2003, you know, our capacity was much larger than it

```
 1    was in 1998.

 2    BY MR. ELLIS:

 3    Q.   But in 2003 you didn't sell any rugs; right?

 4    A.   We sold a lot of rugs in 2003.

 5    Q.   In 2003 you did not sell any of the Diamond Kilim rugs;

 6    correct?

 7    A.   We were using the same looms to weave our pillows.

 8             THE COURT:  Did you sell Diamond Kilim rugs?

 9             THE WITNESS:  No.

10    BY MR. ELLIS:

11    Q.   And in 2004 you did not sell any Diamond Kilim rugs;

12    right?

13    A.   No.

14    Q.   And in 2005 you did not sell any Diamond Kilim rugs?

15    A.   No.

16    Q.   And in 2006 you did not sell any Diamond Kilim rugs;

17    correct?

18    A.   No.

19    Q.   What?

20    A.   I said no.

21    Q.   And in -- up until today, in 2007, you have not sold any

22    Diamond Kilim rugs; right?

23    A.   No.

24             MR. ELLIS:  Nothing further, your Honor.

25             THE COURT:  Thank you.
```

UNITED STATES DISTRICT COURT

1          Redirect?

2          Is that a yes?

3          MR. SONI:  Yes.

4          Your Honor, I think I'll waive redirect.  I think

5     he's answered the questions.

6          THE COURT:  All right.  Anything further from the

7     plaintiff?

8          MR. SONI:  Your Honor, not for this witness.

9          The plaintiff rests.

10         THE COURT:  All right.  Anything in any

11    surrebuttal?

12         MR. ELLIS:  No, your Honor.

13         THE COURT:  Both sides rest?

14         MR. ELLIS:  Yes, your Honor.

15         THE COURT:  All right.

16         MR. ELLIS:  Subject to the admission of the

17    remaining exhibits, your Honor --

18         THE WITNESS:  Was I excused?

19         THE COURT:  Yes.

20         MR. ELLIS:  -- and any motions.

21         THE COURT:  Right.

22         All right.  Ladies and gentlemen of the jury, that

23    completes the evidentiary portion of the case subject to a

24    couple of matters that I will take up with counsel.

25         I am going to excuse you for the rest of the day,

1    the reason being I have a wealth of issues that I need to

2    take up with counsel.  I will be helping them in preparing --

3    as you know and as you -- as I explained to you, jury

4    instructions are very important part of the case.  So I will

5    be giving you those instructions.  I have to coordinate with

6    counsel in working out those instructions.

7            The evidentiary portion is finished.  What remains

8    is my instructions to you and the closing arguments of

9    counsel.

10           Again, I say to you, please do not form any opinion

11   on the case.  Do not discuss the case amongst yourselves or

12   with anyone else.  Even though we're through with the

13   evidentiary portion, you are not to form any opinion or

14   discuss the case until, as I say, we've completed jury

15   instructions and closing argument and you're up in the jury

16   room deliberating, which will occur tomorrow.

17           And so at this point I will excuse you until

18   10:00 o'clock tomorrow.  And have a nice evening.  Get a good

19   jump on the traffic today, and we'll see you tomorrow.

20           Thank you.

21           (Whereupon, at 11:22 a.m., the jury exited the

22           courtroom.)

23           THE COURT:  All right.  Please be seated.

24           For the record, the jurors are no longer present.

25           I want to take up the motions now.

UNITED STATES DISTRICT COURT

1           Well, let me first -- where are the evidentiary --

2    other than 218 and 109, any other evidentiary issues?

3           MR. ELLIS:  Well, 218 is not our issue.

4           THE COURT:  I understand.

5           I'm saying are there any other exhibit issues?

6           MR. ELLIS:  Can I have a moment, your Honor --

7           THE COURT:  Sure.

8           MR. ELLIS:  -- or can I just take up something

9    else, and I'll have an answer for the Court?

10          THE COURT:  Sure.

11          Let me take up the 218 and 109 later, and that is

12   plaintiff's motion to exclude Exhibits 218 and 109.

13          Anything further on that?  I've got the motion and

14   I believe I have the opposition to that -- yes, I do -- which

15   I got this morning, which I have looked at.

16          Anything further?

17          MR. SONI:  Your Honor, we'll, of course, answer any

18   questions you have.  The papers, I think, fairly encompass

19   all of the issues.  I don't want to repeat what the Court

20   already knows.

21          THE COURT:  Okay.  Anything further from the

22   defense?

23          MR. ELLIS:  No, your Honor.

24          THE COURT:  Okay.  I've read the papers.  The

25   motion is denied.

 1          All right.  Next, motion -- plaintiff's motion for

 2    sanctions for -- I believe this relates to the identification

 3    of super rugs.

 4          Anything to add on that?

 5          MR. SONI:  In view of the defendant's

 6    acknowledgement that they received this information at least

 7    at the start of trial, and Mr. Chaudhary's testimony that he

 8    provided it back as early as October of 2004, that clearly

 9    was withholding it as evidence, and we believe that sanctions

10    are appropriate.

11          THE COURT:  Mr. Ellis?

12          MR. ELLIS:  We've argued the point, your Honor.

13    Nothing further.

14          THE COURT:  Motion is denied.

15          All right.  I'll hold that for one second.

16          There's a motion that I want to deal next with, the

17    motion to strike the testimony of plaintiff's -- Kahrs, the

18    plaintiff's expert.  Again, I did with -- by the way, I

19    didn't mention with respect to the motion for sanctions --

20    plaintiff's motion for sanctions, was there any -- I don't --

21    was there any written opposition to that?

22          MR. ELLIS:  It was all oral, your Honor, and we

23    rest on the oral.

24          THE COURT:  Just confirming.  I'm just confirming.

25          All right.  The motion to strike the testimony of

```
 1    Mr. Kahrs -- anything -- I'll hear from the defendants first.
 2              MR. ELLIS:  Your Honor, we filed our papers.
 3              I would just only add to those papers the testimony
 4    that was elicited over cross-examination this morning, which
 5    clearly shows that Mr. Kahrs has changed his opinions, and
 6    the result of those is to present a higher damage figure to
 7    the jury.
 8              THE COURT:  Okay.  And plaintiff?
 9              I've got your opposition.
10              MR. SONI:  Thank you, your Honor.
11              Mr. Kahrs has testified as to the methodology that
12    should be applied in computing plaintiff's damages and in
13    computing defendant's profits.  His testimony remains
14    consistent.  He updated it in view of the testimony that was
15    elicited at trial from the defendants in which they expressly
16    acknowledged that they had not produced all customs and
17    freight documents, had not produced any overhead documents.
18    In view of that he updated that analysis.
19              THE COURT:  It seems to me you are concerned that
20    you found out about -- you contend that he should have
21    updated when he found out about super rugs a week or a
22    whatever, a few days before.  And, again, here the -- there
23    was no evidence made while Mr. -- I can never pronounce this
24    name -- in Surya.
25              MR. ELLIS:  "Chaudhary."
```

```
 1              THE COURT:  Yeah.

 2              Said that he made that statement.  There was no

 3    confirmation that that ever actually happened or that the

 4    defense knew about it.  But you concede that he knew about it

 5    the day before, but you had to have known that your expert

 6    was going to change his opinion.

 7              Did you advise them that he was going to change his

 8    report?

 9              MR. SONI:  They examined him at length during his

10    deposition, at which time he described the methodology he

11    would use.  He indicated --

12              THE COURT:  No, I'm asking a simple question.

13              He conceded today he changed his information.  He

14    made some adjustments.

15              MR. SONI:  He made adjustments.

16              THE COURT:  Did you ever tell the defense there are

17    some changes to the report before you put him on the stand?

18    You knew it was going to happen.

19              MR. SONI:  We knew it was going to happen only

20    after the evidence was elicited from the defendants during

21    trial.

22              THE COURT:  Okay.  And at some point he just

23    testified in conversations with you and with Mr. Singh he

24    changed his testimony from his report.

25              Did you ever tell the defense that was going to
```

UNITED STATES DISTRICT COURT

```
 1    happen?
 2            MR. SONI:  He did that, your Honor, after
 3    examination.  It was the same day that the defendants say --
 4    it was the same day or the next day that the defendants
 5    provided their testimony.
 6            THE COURT:  When he first testified -- there were
 7    some changes when he first testified.
 8            MR. SONI:  When he first testified, he made
 9    adjustments based upon the evidence he heard and was told
10    that the defendants produced.
11            THE COURT:  It seems to me what is good for the
12    goose is going to be good for the gander if you're going to
13    make that position.
14            But anything else?
15            MR. SONI:  In sum, your Honor, Mr. Kahrs did not,
16    in his report nor on the stand, provide a specific number
17    that he believes is awarded.  But what he did was
18    computations under the various methodologies so the jury can
19    ultimately decide.
20            THE COURT:  Thank you.
21            Mr. Ellis?
22            MR. ELLIS:  I don't know where the Court is leaning
23    on this issue but --
24            THE COURT:  You'll find out in few moment.
25            MR. ELLIS:  I know that, your Honor.
```

1          The only thing I would have in response is that --

2     we did make a second point here, your Honor, is that if the

3     expert report is going to have meaning, if the Rule 26 is

4     going to have meaning, they certainly cannot go higher than

5     what they had in the expert report because that changes the

6     whole case.

7          THE COURT:  Okay.  Thank you.

8          All right.  The -- in my view with respect to the

9     change, yes.  The witness did concede he changed his

10    position.  The changes to me appear and the dollar figures on

11    this case, I was considering transferring it to small claims.

12    The changes I think -- I don't think there was a significant

13    change in methodology.  I don't think -- and I don't think

14    the numbers change this significantly where there's such a

15    dramatic change that this was the type of thing where

16    sanctions would be appropriate or we're -- he violated his

17    duties.  I think that it appeared to me the cost was handled

18    quite well, and it seems to me that the defense recovered

19    pretty well from what were -- some modifications.  I think

20    those -- his modifications and everything, significant

21    changes.  Therefore, the motion is denied.

22         And, finally, I'll deal with the motion for

23    judgment as a matter of law.

24         MR. SONI:  Your Honor, before we get to that there

25    was also a motion with respect to Mr. Strombom, defendant's

1    expert.

2             THE COURT:  Yes.  You're right, yes.

3             MR. SONI:  Mr. Strombom was apparently provided a

4    financial statement which he relied upon to do his

5    computations, which was never provided to the plaintiff

6    during discovery.  And Mr. Rogakos testified that it was

7    never provided.  We've asked for Mr. Strombom's testimony to

8    be -- to be stricken because of that.

9             THE COURT:  Mr. Ellis?

10            MR. ELLIS:  It's the same ruling that the Court

11   made with respect to 109 and 218, same consistent position on

12   both sides, I believe.

13            THE COURT:  Well, what about -- there was some

14   evidence, was there not -- there was something that was not

15   provided.  I mean, I am, frankly, not persuaded by

16   plaintiff's sweeping claims that evidence hasn't been

17   provided during discovery.

18            There was testimony that the documentary --

19   underlying documentary evidence was provided.  I have not had

20   identified, with respect to seeing some more specific

21   indications from the plaintiff, as to what hasn't been

22   provided given these sweeping allegations, but there was

23   testimony, was there not, at least as to one document.

24            MR. ELLIS:  Yes.  That's correct, your Honor.

25            But I guess what I'm saying, your Honor, is that

UNITED STATES DISTRICT COURT

1    there was not a financial report that was produced that

2    Mr. Strombom had requested directly from the client that

3    had --

4              THE COURT:  Slow down.  Slow down.

5              MR. ELLIS:  Sure, your Honor.

6              And so that is the document that they're claiming

7    should have been produced to test the credibility of

8    Exhibit 109.  What I'm saying is that if the Court, having

9    considered that issue with respect to 109, it's the same

10   issue with respect to Mr. Strombom in his testimony.

11             The other point that I would add, your Honor, is

12   that where we are, based on the Court's rulings, if it

13   appeared to be appropriate, they have now elicited from their

14   expert that you can't consider the reduction in cost and so

15   they've thrown those out.

16             And that's exactly what should happen at the trial,

17   at least in my mind.  If you don't bring a motion to deal

18   with it in discovery, you attack the credibility of the

19   document, you attack the credibility of the witnesses, but

20   you don't exclude the witnesses entirely because that's just

21   too severe of a sanction without any proper showing of bad

22   faith.

23             MR. SONI:  What we have is an admission they didn't

24   produce the financial statements.  What we have is an expert

25   that relied upon a financial statement.  26-A, 37-D, the

1    pretrial conference rules, all of the rules of -- the federal

2    rules make it real clear that if you don't produce something

3    you can't rely on it at trial.  Their expert relied on it.

4         The general and administrative expenses and

5    overhead are specifically drawn from the financial statement.

6    He claimed that the shipping expenses, the customer's freight

7    expenses were also verified through the financial statements,

8    never produced to us, and it must be stricken.

9         109 also replied upon the same documents.  It was

10   a litigation document that the defendants created.  We

11   objected to that.  Your Honor ruled it's admitted, and your

12   Honor is going to allow that.  But there is no justification

13   to allow them to withhold evidence during discovery, admit

14   that they withheld that evidence, rely upon it with their

15   expert, and present it to the jury.  It should be stricken.

16        THE COURT:  It's denied.

17        Next I've got the motion for judgment as a matter

18   of law, and I've got your opposition to it.

19        You're the moving party on it, Mr. Ellis.

20        MR. ELLIS:  Your Honor, this particular motion for

21   judgment of law I think really speaks to the central issue in

22   this case and the quality of the evidence.  The question

23   presented by this motion is whether or not the unsupported,

24   oft-contradicted and suddenly changed testimony of Harpal

25   Singh is enough to get this case to the jury.  As our papers

1    set forth, we believe it is not.

2            The only showing of access that was ever made by

3    the plaintiffs with respect to the person who could have been

4    influenced by the design was testimony elicited by Mr. Singh

5    which, under cross-examination of the rebuttal case, he

6    recanted.

7            On direct, in his case-in-chief, he talked about

8    trade shows.  He talked about rugs being made all across

9    Panipat that Mr. Sudhar Chaudhary would have had to have

10   seen.

11           In his rebuttal case, he acknowledged and admitted

12   that he could not say for sure that Mr. Chaudhary ever saw

13   the rug.

14           THE COURT:  But isn't it true in copyright law if

15   the jury concluded that the designs were sufficiently

16   similar, access may be precluded?

17           MR. ELLIS:  No.  It is not correct to say that.

18           THE COURT:  If I write a book, and you write

19   virtually the same book, and excluding the old saw that if

20   you put -- what's the old one?  A thousand books that wrote

21   the Encyclopedia Britannica and the jury concludes that it is

22   exactly verbatim the book that I wrote, that may be

23   sufficient.  They don't necessarily have to show that you

24   absolutely saw my book.

25           MR. ELLIS:  That is correct.

UNITED STATES DISTRICT COURT

1          THE COURT:  Right.

2          MR. ELLIS:  However, what we have in this

3   particular case is that there are similarities between the

4   rugs.  No one, including their own expert, Mr. Denny, has

5   testified that they're strikingly similar.  There's been an

6   insufficient showing of that issue, your Honor.

7          Mr. Denny, under cross-examination by me, your

8   Honor, admitted that he could not equivocally say --

9   unequivocally say, rather, that there had been absolute

10  copying of the plaintiff's designs by our clients.  What he

11  had said is that we -- both parties, plaintiff and

12  defendant -- could have copied the preexisting design.

13  That's the same testimony as offered by Mr. Davies.

14         He also acknowledged that plaintiff's rug could

15  have copied our rug.  So there's no showing of exact

16  identical copying of the same rug.  And that's what our

17  motion speaks to.  There's been insufficient showing of

18  access; and, therefore, they have to prove that the rugs are

19  substantially -- or not even substantially but strikingly

20  similar, your Honor.  As the Court has said, that would

21  require a showing of virtual identicalness.

22         And that has not been shown.  It has not been

23  testified by any party in this case.  Mr. Singh to -- went

24  through painstaking attempts to acknowledge and to testify

25  that his rug was substantially different.  It was a better

1    quality.  It cost more.  It was wool on wool.  It was bright

2    colors.  All the different changes that existed to make his

3    rug different, significantly different.  Our clients agreed

4    with Mr. Singh and said that they were different.  Our expert

5    agreed that there was significant difference.  Mr. Denny

6    agreed that there were differences.

7            So what you have, your Honor, is -- is the

8    testimony of Mr. Singh and two rugs.  That's not enough to go

9    to the jury in a copyright case.  It simply is not.  In all

10   the music cases and all the cases that deal with copyright,

11   it usually takes something more than just the plaintiff's

12   testimony.  I think that stole my -- my music or it stole my

13   rift.

14           You have to have expert witnesses to prove that, to

15   say that they're so similar that there's no way that one

16   could be made without the other.  Their expert did not do

17   that -- did not do that.  So what we are left with, your

18   Honor, is the question that I raised in my opening and I

19   continue to raise to this day is whether the unsupported,

20   often contradicted, and recanted testimony of Mr. Harpal

21   Singh is enough to get this case to the jury.

22           We respectfully submit it is not.

23           MR. SONI:  There clearly was access.  Pottery

24   Barn's catalogs were distributed to millions.  Crate and

25   Barrel catalogs were distributed to millions.  Mr. Mazarakis,

1    Mr. Rogakos acknowledged that those two companies are their

2    customers.  They received their catalogs.  They sold to

3    Pottery Barn during the same relevant period in 1998 to 2000,

4    when the Diamond Kilim rug was shown in that catalog.

5    Mr. Rogakos acknowledged that they look at their own products

6    and they look at the catalogs that are brought in -- sent in

7    from Pottery Barn.  There was access at that particular

8    level.

9            In addition, Mr. Mazarakis was in Panipat during

10   that relevant period, 1998 to 2000.

11           In addition, Mr. Chaudhary testified that he was

12   active in the marketplace in 1998 to 2000.  He did business

13   with Super Rugs, which he acknowledges also provided and

14   produced for Aseem Imports, who was the company that Classic

15   Concepts bought the rugs from.

16           So Aseem was producing the Diamond Kilim rugs from

17   1998 to 2000.  Super Rugs was producing it between 1998 to

18   2000.  And Surya was there and doing business with Super Rugs

19   during that time period.  It clearly was accessed.

20           There's ample evidence from which the jury can

21   conclude that, whether consciously or unconsciously,

22   Mr. Chaudhary in Surya looked at that design, were influenced

23   by that design, or copied that design.

24           The same is true with respect to Mr. Mazarakis and

25   Hellenic.  The fact that they had access to those catalogs

1    certainly puts on notice to the jury the possibility, and

2    more than that the likelihood that they were influenced by

3    that presence and the fact that it was -- had sold in

4    Pottery Barn for a long period of time in their selection

5    process when they selected.

6              Ultimately, intent does not require -- Mr. Ellis

7    inappropriately argued to the jury about popping over -- your

8    head over somebody's fence and a wall and looking and peeking

9    and rushing out to make a duplicate.  That's not a

10   requirement here.

11             THE COURT:  Slow down.

12             MR. SONI:  So what we do have is ample evidence

13   from what the jury to find there is access.  There is an

14   inverse ratio application as to the degree of access

15   necessary, depending upon the degree of similarity between

16   the products.

17             With respect to the similarity between the

18   products, the jury has both before it.  They can evaluate the

19   extent of the similarity and the extent of the differences.

20   We are not contending, nor have we ever contended that the

21   defendant's rug is identical.

22             We have said it is similar.  We have shown that all

23   the elements have been appropriated, and it is more than just

24   similar.  It is substantially similar.  It's strikingly

25   similar.  The testimony of Mr. Davies, defendant's expert,

1    confirms that.

2          He acknowledges it is similar.  He also says that

3    they are so similar they may have come from the same source,

4    or they could have been copied from each other.

5          Mr. Denny said the same thing.  Even the defendants

6    themselves admitted that the rugs are similar.  There is more

7    than enough to go to the jury on this.

8          Whether the jury believes Mr. Chaudhary and his

9    claim about independent copying -- because he didn't create

10   it.  He claims he copied it from somebody else or Super Rugs

11   did -- or whether the jury concludes that because of the

12   amount of access and because the degree of similarity there

13   was an unlawful appropriation, that's the jury's province.

14         THE COURT:  All right.  Anything else?

15         MR. ELLIS:  It appears to me that the Court is

16   ready to rule.  So nothing further.

17         THE COURT:  I'm going to reserve this under

18   Rule 5008, given the comments of the rule, as the verdict

19   will rule it; so I will reserve it under Rule 50B, and you

20   know your requirements under that.

21         MR. ELLIS:  I do understand.

22         THE COURT:  Thank you.

23         All right.  At this point are there any other

24   motions that I've missed?

25         MR. SONI:  Plaintiff's motion for a judgment as a

1    matter of law.  Since the defendants have now rested, we

2    would bring such a motion.

3            THE COURT:  Do I have a written motion from you?

4            MR. SONI:  I do have a written one, your Honor.

5    The court's clerk's office was not open this morning.

6            THE COURT:  Have you seen it Mr. Ellis?

7            MR. ELLIS:  No.

8            MR. SONI:  We served him.

9            THE COURT:  Why wasn't Mr. Ellis --

10           MR. SONI:  We waited until the rest of the case in

11   case there was something else that needed to be dealt with.

12           THE COURT:  Well, I'll let Mr. Ellis deal with it.

13           Why don't you take a look at it and see if

14   there's -- can the Court have a copy?

15           MR. SONI:  Yes.

16           THE COURT:  Mr. Ellis, do you want an opportunity

17   to respond in writing or do you wish to just simply argue?

18           MR. ELLIS:  I think I can make the point, your

19   Honor, that this is the opposite of our motion.

20           And more importantly than that, it is completely --

21   it is -it completely contradicts with -- Mr. Soni's prior

22   statements completely contradict this.  He said that there

23   was enough to go to the jury.  What he's now saying in his

24   motion is that there's only one conclusion the jury can

25   reach.

1        And I just don't know that it's even necessary to

2    file a written response that makes the point that you can't

3    just send the jury back with two rugs and say you have to

4    only conclude that this is a copy of the other.  That's

5    clearly not the standard.  I really just would prefer not to

6    have Mr. Stover working over the night to respond to this

7    because I just don't even think it's a close call here, but

8    we would reserve if the Court feels that's necessary.

9        MR. SONI:  We've made out a prima facie case, and

10   there's nothing to contradict it.  We've established the

11   creation and the validity of the copyright and the

12   originality of the copyright through independent creation by

13   Mr. Singh and Mr. Mehta.  We've demonstrated access, and we

14   have demonstrated substantial similarity.

15       There is no bases that has been supportable for a

16   defendant s's claim of an independent creation.  In fact,

17   their expressed testimony of their supplier is that he didn't

18   create.  He copied it.  He copied it from a supplier, got a

19   sample, and the supplier, Super Rugs, copied it from somebody

20   else.  So the independent creation defense that they assert

21   or raise simply doesn't stand up based on the testimony.

22       In addition, the claim that there was a preexisting

23   design, which is the KR-24, the defendant's rug, in 1995 has

24   not been supported.  There is an unverified, unclear

25   testimony of Mr. Chaudhary without reference to any specific

1    design or rug, without support from any documentary evidence

2    or any other corroborating evidence.

3              In the face of such weak evidence and the adverse

4    inference that must be presented in the case like this and

5    that's been adopted by the Ninth Circuit, defendants have

6    simply failed to carry their burden of proof.

7              Infringement, your Honor, is not -- is a strict

8    liability tort.  It does not require intent.  If there's a

9    use of the copyrighted design in a different product, even if

10   the different product is -- is different in style or has

11   differences in changes, that would still be an unauthorized

12   derivative work.

13             So there has been, without dispute, use of the

14   design, display of the design, distribution of the design, in

15   a rug which has some differences and can be described as

16   nothing other than a derivative work without authority.

17   That's a strict liability tort.  That's an infringement.

18             THE COURT:  Thank you.

19             MR. ELLIS:  One final point, your Honor.

20             THE COURT:  I'm going to reserve this under 50B as

21   well.

22             MR. ELLIS:  Okay.

23             THE COURT:  I think, depending --

24             MR. ELLIS:  Can I just make one point for the

25   record, your Honor, since we're not going to file a written

1    point?

2              THE COURT:  Well, it's reserved under 50B and --

3    but you may be limited to what you argue here, so....

4              MR. ELLIS:  Right.

5              The one point that I wanted to make, your Honor, is

6    that those standards under -- for judgment as a matter of law

7    under Rule 50 are different for a defendant than a plaintiff.

8    And Mr. Soni's argument essentially said the standard for a

9    defendant.  He was trying to point to an absence of evidence

10   on our part, and we obviously don't agree with that.

11             THE COURT:  Slow down.

12             MR. ELLIS:  But it is insufficient for the

13   plaintiff to say they did not prove their case, the

14   defendant.  He's applying a different standard.  He's saying

15   that we produced weak evidence.  Weak evidence is enough to

16   go to the jury.  And I would disagree to say that we

17   obviously produced strong evidence.

18             But that was the final point I wanted to make, your

19   Honor.

20             THE COURT:  All right.  What I'm going to do is I'm

21   going to reserve under 50B.  However, since this motion was

22   just presented, I'll let you have, if you wish to, until

23   tomorrow to get your opposition on file so that the records

24   will be made on both.

25             And I suspect whichever one will be renewed will

1    depend on the jury's verdict.

2              MR. ELLIS:  Thank you, your Honor.

3              THE COURT:  So if you wish, you may get one on file

4    by end of business tomorrow.

5              MR. ELLIS:  Thank you, your Honor.

6              MR. SONI:  Your Honor, may I just respond to what

7    Mr. Ellis said?  And I promise not to make it longer than two

8    sentences.

9              THE COURT:  Go ahead.

10             MR. SONI:  We had made our prima facie case.  What

11   defendants are trying to prove is their affirmative defenses.

12   That, they had their burden on.

13             THE COURT:  All right.  Thank you.

14             Now, the question of jury instructions and

15   verdicts.  As I said, what I received -- and I received it in

16   relays yesterday.  I got some of this this morning on jury

17   instructions, but that is not what I told everyone to do.

18   What I told you to do is what I expect in any case.

19             At this point the evidence is all in.  You know

20   what the evidence is.  I want jury instructions that are not

21   argumentative; that do not exclude relevant portions of the

22   law.  The evidence being in, it seems to me that as

23   professionals you all can agree on more than -- what is

24   it? -- two or three or maybe four of these myriad jury

25   instructions.  So I'm going to give you another chance to do

1    that.

2              What I want is -- and I expect to see is some

3    agreement on instructions that correctly state the law

4    without telling the jury how they should find, which some of

5    them do, and which are fair given the evidence.

6              I expect them to be on a disc and in our copy.  I

7    expect there to be an index for the Court to use in referring

8    to.  I want a copy that is annotated and a copy that is

9    unannotated.  Obviously the annotations do not go to the

10   jury, nor will the index.

11             And you are -- what I will have you do is come in

12   at 8:30 tomorrow, and I want something emailed, and Jake will

13   give you the email.  It will include the agreed-upon

14   instructions, and I expect to see a lot more of them than I

15   have seen.  I have handled -- presided over much more

16   difficult copyright cases than this, and the parties have

17   been able to agree on the applicable law and instructions.

18   Obviously, your arguments are up to you.

19             And the disputed ones in a document with each

20   side's position on the disputed instruction.  I don't want

21   a whole lot of separate documents coming in that I have to

22   get -- my staff will have to try to correlate.  You all know

23   how to do it.  You can do it.

24             Same thing with the verdict form.  I would

25   anticipate that there could be some additional agreement on

1    that, but, again, I have separate documents and objections.

2    I want a document, hard copy disc.

3            And certainly with respect to the jury instructions

4    and the verdict forms, given where we are, I will anticipate

5    having those emailed to the Court so that I start looking at

6    them overnight by 6:00 o'clock today.

7            We will be here to get them, and then they will be

8    filed with the disc and a hard copy in the morning.  And we

9    will meet at 8:30.  And I will have had an evening to look

10   over what you've got, along with my staff, and hopefully have

11   some sort of constructive suggestions.  And when we have

12   concluded that we will bring the jury back, and you will have

13   your instructions and you will have closing.

14           Your time at this point, plaintiff has one hour and

15   two minutes.  Defense has four hours.  So at this there point

16   defense is at 12 hours and 26 minutes.  The plaintiff is at

17   16 hours and 28 minutes.  As I had said before, those time

18   lines will be strictly enforced.

19           Mr. Soni.

20           MR. SONI:  Yes, your Honor, two things.

21           I wanted to point out to the Court that we were

22   sufficient -- significantly hampered in our examination

23   because of the use of the interpreter for a witness that

24   otherwise said he did have considerable English language

25   capability.  That ate up a good deal of our time.

```
1              In addition, your Honor, I would point out to the

2    Court that the defendants waived their counterclaims and are

3    down to essentially two affirmative defenses.  We had the

4    entire case-in-chief to present.

5              I am going to ask -- and I understand the Court has

6    previously said that you wanted to hold us to our time, but

7    I'm going to ask for a little additional time in

8    consideration of these issues.

9              THE COURT:  Mr. Ellis?

10             MR. ELLIS:  What's good for the goose is good for

11   the gander.

12             THE COURT:  I made it clear at the outset.  I

13   didn't cut you down.  I put you, counsel, to a five to -- you

14   know what you had to prove.  If they wanted to reduce their

15   case, that's up to them.  But -- and you know what you needed

16   to prove.  You knew what your case was going to be.  Those

17   time limits will be strictly enforced.

18             Thank you.

19             MR. SONI:  Additionally, your Honor, last issue.

20             THE COURT:  Sure.

21             MR. SONI:  Logistics -- will you be instructing the

22   jury before closing argument --

23             THE COURT:  Yes.

24             MR. SONI:  -- or after closing argument?

25             THE COURT:  I instruct before closing argument
```

UNITED STATES DISTRICT COURT

1    except for the closing instructions.  I think that's helpful

2    because that way counsel can use the instructions they wish

3    to in their closing without having to check on that ahead of

4    time before your closing.  So I do the instructions except

5    for the final instructions.  You will do your closings, and

6    then I will do the final few instructions to the jury.

7              MR. SONI:  And we'll also have the final special

8    verdict form in place before we begin our closings.

9              THE COURT:  That's my order; that I have that by --

10   along with the jury instructions by 6:00 o'clock.

11             MR. SONI:  Very good.

12             Thank you.

13             THE COURT:  Thank you, everybody.  Get busy.

14             Off the record.

15        (Whereupon, at 11:54 a.m., the proceeding concluded.)

16

17

18

19

20

21

22

23

24

25